IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

EASTERN DISTRICT—PHILADELPHIA 1855-6.

### Passmore Williamson's Case.

A petition for *habeas corpus* will be denied when it appears by the petitioner's own showing that he is legally confined.

Upon a *habeas corpus* the judgment even of a subordinate state court having jurisdiction of the subject-matter, cannot be reviewed in this court; but such judgment, however erroneous, must be taken as legal and valid until reversed on writ of error or appeal.

This principle is applicable, *à fortiori*, to the judgment of a federal court.

A party convicted in one of the federal courts of an offence against the United States, and confined in pursuance of a sentence pronounced there, cannot be discharged on *habeas corpus* by this court.

Contempt of court is a substantive criminal offence; and the power to punish it belongs to the court in which it is committed.

The District Court of the United States, like all other courts, has authority to punish a party for contempt in disobeying its process; and its judgment upon an offender of that class is conclusive and cannot be re-examined in a state court.

A conviction and sentence for contempt are not the less conclusive because the contempt was committed while the District Court was investigating or trying to investigate a matter which it had no right finally to determine.

The proceeding against a party for contempt is wholly distinct and separate from the cause pending when the contempt was committed: as distinct as an indictment for perjury is from the proceeding in which the false oath was taken.

It is no defence, on a trial for contempt, to show that it merely obstructed the progress of an investigation which the court would have been obliged in the end to dismiss for want of jurisdiction.

If such a defence were good and legal, the party accused would be bound to make it on his trial for the contempt: he could not withhold it until after his conviction, and then, by means of a *habeas corpus*, produce it before a different tribunal.

THIS was an *ex parte* application, by Passmore Williamson, to the Supreme Court sitting in banc at Bedford, on the 11th day of August, 1855, for a writ of *habeas corpus*.

(9)

[Passmore Williamson's Case.]

The petitioner, in his application, set forth that he is a citizen of Pennsylvania, residing in the city of Philadelphia, and a member of the "Pennsylvania Society, for promoting the abolition of slavery, and for the relief of free negroes unlawfully held in bondage, and for improving the condition of the African race," incorporated 8th December, 1789. That, on the 18th of July, 1855, he was informed that certain negroes, held as slaves, were then in Philadelphia, brought by their master, John H. Wheeler, into this state, with the intention of passing through to other parts, and that, believing them entitled to their freedom by reason of having been voluntarily brought by their master into this state; and, in fulfilment of his official duty as secretary of the acting committee of the said society, he followed the said slaves to the steamboat of the New York line, then lying near Walnut street wharf. That they consisted of the woman, Jane, aged about thirty-five years—her sons, Daniel about twelve, and Isaiah aged about seven years. That, in the presence of their said master, he informed the woman, Jane, that she was free by the laws of Pennsylvania—upon which she expressed her desire to have her freedom; and, with her children, left the boat of her own free will and accord, and without any coercion of any kind. That, when he saw her in possession of her liberty, with her children, petitioner returned to his place of business, and has not since seen her, or either of her children, nor does he know where they are.

The petitioner further stated that he used no violence whatever, except to hold back Colonel Wheeler, their former master, when he attempted by force to prevent Jane from leaving the boat.

That several negroes, and others employed about the wharf, had followed him on to the boat, but that he had no pre-concert with them, nor were they there by his invitation; and that, being there, they used no violence or threats, except some expression of feeling at Colonel Wheeler attempting to detain the woman by force.

That on the 20th July, 1855, he was served with an *alias habeas corpus*, issued out of the District Court of the United States for the Eastern District of Pennsylvania, upon the petition of the said John H. Wheeler, commanding him to produce the bodies of the said Jane and her children before the Hon. J. K. Kane, judge of said court. The petitioner, on the same day, duly made return "that the said Jane, Daniel, and Isaiah, nor either them, were not then, nor at the time of issuing the writ, or the original writ, or at any other time, in the custody, power, or possession of, nor confined, nor constrained of their liberty by your petitioner: therefore, he could not have the bodies of the said Jane, &c., before the said judge, as by the said writ he was commanded."

[Passmore Williamson's Case.]

Whereupon it was ordered and adjudged by the said court, that the petitioner be committed to the custody of the marshal, without bail or mainprise, as for a contempt in refusing to make return to the writ of *habeas corpus* heretofore issued against him at the instance of John H. Wheeler.

That, in pursuance of said order, he was, by the said marshal, conveyed to Moyamensing Prison, and was, at the time of making his application, detained there without bail or mainprise.

The petitioner further states that he had applied to the honourable Chief Justice of this court for a writ of *habeas corpus*, which had been refused. He also sets forth the legal grounds upon which he based this application, and the right to be discharged from imprisonment.

The record of the District Court of the United States, referred to in the petition of the relator, shows that J. H. Wheeler presented his petition to the District Court of the United States, setting forth that he was the owner of three persons of colour, Jane, Daniel, and Isaiah, held to service by the laws of Virginia, and that they were detained from his possession by one Passmore Williamson, of the city of Philadelphia, and were not detained for any criminal matter. He therefore prays for a writ of *habeas corpus*, to be directed to the said Williamson, commanding him to produce their bodies, &c. The writ was granted on the 18th July, and on motion, an *alias* was issued, which was served, to which the return stated was made by the relator in this case.

The petition concludes with a prayer for a writ of *habeas corpus*, directed to the keeper of the said prison, commanding him to bring the petitioner before the court, to abide such order as the court may direct.

The record further sets forth the opinion of the district judge, exhibiting the facts of the case as found by the court, and the action of the court thereon, which, so far as material to this case, is as follows :—

" Colonel John H. Wheeler, of North Carolina, the United States' minister to Nicaragua, was on board a steamboat at one of the Delaware wharves, on his way from Washington, to embark at New York for his post of duty. Three slaves belonging to him were sitting at his side, on the upper deck.

" Just as the last signal-bell was ringing, Passmore Williamson came up to the party, declared to the slaves that they were free, and, forcibly pressing Mr. Wheeler aside, urged them to go ashore. He was followed by some dozen or twenty negroes, who, by muscular strength, carried the slaves to the adjoining pier; two of the slaves at least, if not all three, struggling to release themselves, and protesting their wish to remain with their master; two of the negro mob in the mean time grasping Colonel Wheeler by the collar, and threatening to cut his throat if he made any resistance.

[Passmore Williamson's Case.]

"The slaves were borne along to a hackney coach that was in waiting, and were conveyed to some place of concealment; Mr. Williamson following and urging forward the mob, and giving his name and address to Colonel Wheeler, with the declaration that he held himself responsible towards him for whatever might be his legal rights, but taking no personally active part in the abduction after he had left the deck.

"I allowed a writ of *habeas corpus* at the instance of Colonel Wheeler, and subsequently an *alias;* and to this last Mr. Williamson made return that the persons named in the writ, 'nor either of them, are not now, nor was at the time of issuing of the writ, or the original writ, or at any other time, in the custody, power, or possession of the respondent, nor by him confined or restrained; wherefore he cannot have the bodies,' &c.

"At the hearing I allowed the relator to traverse this return; and several witnesses, who were asked by him, testified to the facts as I have recited them. The district attorney, upon this state of facts, moved for Williamson's commitment: 1, for contempt in making a false return; 2, to take his trial for perjury.

"Mr. Williamson then took the stand to purge himself of contempt. He admitted the facts substantially as in proof before, made it plain that he had been an adviser of the project, and had given it his confederate sanction throughout. He renewed his denial that he had control at any time over the movements of the slaves, or knew their present whereabouts. Such is the case as it was before me on the hearing.

"I cannot look upon this return otherwise than as illusory—in legal phrase, as evasive, if not false. It sets out that the alleged prisoners are not now, and have not been since the issue of the *habeas corpus*, in the custody, power, or possession of the respondent; and in so far it uses legally appropriate language for such a return. But it goes further, and by added words, gives an interpretation to that language essentially variant from its legal import.

"It denies that the prisoners were within his power, custody, or possession *at any time whatever*. Now, the evidence of respectable, uncontradicted witnesses, and the admission of the respondent himself, establish the fact beyond controversy that the prisoners were at one time within his power and control. He was the person by whose counsel the so-called rescue was devised. He gave the directions, and hastened to the pier to stimulate and supervise their execution. He was the spokesman and first actor after arriving there. Of all the parties to the act of violence, he was the only white man, the only citizen, the only individual having recognised political rights, the only person whose social training could certainly interpret either his own duties or the rights of others under the Constitution of the land.

[Passmore Williamson's Case.]

" It would ·be futile, and worse, to argue that he who has organized, and guided, and headed a mob to effect the abduction and imprisonment of others—he in whose presence and by whose active influence the abduction and imprisonment have been brought about, might excuse himself from responsibility by the assertion that it was not his hand that made the unlawful assault, or that he never acted as the jailer.   He who unites with others to commit a crime, shares with them all the legal liabilities that attend on its commission.   He chooses his· company and adopts their acts.

" This is the retributive law of all concerted crimes; and its argument applies with peculiar force to those cases in which redress and prevention of wrong are sought through the writ of *habeas corpus*.   This, the great remedial process by which liberty is vindicated and restored, tolerates no language in the response which it calls for that can mask a subterfuge.   The dearest interests of life, personal safety, domestic peace, social repose, all that man can value, or that is worth living for, are involved in this principle.   The institutions of society would lose more than half their value, and courts of justice become impotent for protection, if the writ of *habeas corpus* could not compel the truth, full, direct, and unequivocal, in answer to its mandate.

" It will not do to say to the man whose wife or whose daughter has been abducted, ' I did not abduct her; she is not in my possession; I do not detain her, inasmuch as the assault was made by the hand of my subordinates, and I have forborne to ask where they propose consummating the wrong.'

" It is clear, then, as it seems to me, that in legal acceptance the parties whom this writ called on Mr. Williamson to produce were at one time within his power and control; and his answer, so far as it relates to his power over them, makes no distinction between that time and the present.   I cannot give a different interpretation to his language from that which he has practically given himself, and cannot regard him as denying his power over the prisoners now, when he does not aver that he has lost the power which he formerly had.

" He has thus refused, or at least he has failed, to answer to the command of the law.   He has chosen to decide for himself upon the lawfulness as well as the moral propriety of his act, and to withhold the ascertainment and vindication of the rights of others from that same forum of arbitrament on which all his own rights repose.   In a word, he has put himself in contempt of the process of this court, and challenges its action.

" The cause was submitted to me by the learned counsel for the respondent, without argument, and I have therefore found myself at some loss to understand the grounds on which, if there be any such, they would claim the discharge of their client.   One

only has occurred to me as perhaps within this view; and on this I think it right to express my opinion. I will frankly reconsider it, however, if any future aspect of the case shall invite the review.

"It is this: that the persons named in this writ as detained by the respondent were not legally slaves, inasmuch as they were within the territory of Pennsylvania when they were abducted.

"1. That I know of no statute, either of the United States, or of Pennsylvania, or of New Jersey, the only other state that has a qualified jurisdiction over this part of the Delaware, that authorizes the forcible abduction of any person or anything whatsoever, without claim of property, unless in aid of legal process.

"2. That I know of no statute of Pennsylvania which affects to divest the rights of property of a citizen of North Carolina, acquired and asserted under the laws of that state, because he has found it needful or convenient to pass through the territory of Pennsylvania.

"3. That I am not aware that any such statute, if such a one were shown, could be recognised as valid in a court of the United States.

"4. That it seems to me altogether unimportant whether they were slaves or not. It would be the mockery of philanthropy to assert that, because men had become free, they might therefore be forcibly abducted.

"Let Mr. Williamson, the respondent, be committed to the custody of the marshal without bail or mainprise, as for a contempt of the court in refusing to answer to the writ of *habeas corpus*, heretofore awarded against him at the relation of Mr. Wheeler."

*Gilpin* and *Meredith*, for the petitioner.

The opinion of the court was delivered by

BLACK, J.—This is an application by Passmore Williamson for a writ of *habeas corpus*. He complains that he is held in custody under a commitment of the District Court of the United States for a contempt of that court in refusing to obey its process. The process which he is confined for disobeying was a *habeas corpus* commanding him to produce the bodies of certain coloured persons claimed as slaves under the law of Virginia.

Is he entitled to the writ he has asked for? In considering what answer we shall give to this question, we are, of course, expected to be influenced, as in other cases, by the law and the Constitution alone. The gentlemen who appeared as counsel for the petitioner, and who argued the motion in a manner which did them great honour, pressed upon us no considerations, except those which were founded upon their *legal* views of the subject.

It is argued with much earnestness, and no doubt with perfect sincerity, that we are bound to allow the writ, without stopping to

[Passmore Williamson's Case.]

consider whether the petitioner has or has not laid before us any probable cause for supposing that he is illegally detained—that every man confined in prison, except for treason or felony, is entitled to it, *ex debito justitiæ*—and that we cannot refuse it without a frightful violation of the petitioner's rights, no matter how plainly it may appear on his own showing that he is held in custody for a just cause. If this be true, the case of Ex parte Lawrence (5 *Binn*. 304) is not law. There the writ was refused, because the applicant had been previously heard before another court. But if every man who applies for a *habeas corpus* must have it, as a matter of right, and without regard to anything but the mere fact that he demands it, then a court or a judge has no more power to refuse a second than a first application.

Is it really true that the special application which must be made for every writ of *habeas corpus*, and the examination of the commitment, which we are bound to make before it can issue, are mere hollow and unsubstantial forms? Can it be possible that the law and the courts are so completely under the control of their natural enemies that every class of offenders against the Union or the state, except traitors and felons, may be brought before us as often as they please, though we know beforehand, by their own admissions, that we cannot help but remand them immediately? If these questions must be answered in the affirmative, then we are compelled, against our will and contrary to our convictions of duty, to wage a constant warfare against the federal tribunals by firing off writs of *habeas corpus* upon them all the time. The punitive justice of the state would suffer still more seriously. The half of the Western Penitentiary would be before us at Philadelphia, and a similar proportion from Cherry Hill and Moyamensing would attend our sittings at Pittsburgh. To remand them would do very little good; for a new set of writs would bring them all back again. A sentence to solitary confinement would be a sentence, that the convict should travel for a limited term up and down the state, in company with the officers who might have him in charge. By the same means the inmates of the lunatic asylums might be temporarily enlarged, much to their own detriment; and every soldier or seaman in the service of the country could compel their commanders to bring them before the court six times a week.

But the *habeas corpus* act has never received such a construction. It is a writ of right, and may not be refused to one who shows a *prima facie* case entitling him to be discharged or bailed. But he has no right to demand it who admits that he is in legal custody for an offence not bailable; and he does make what is equivalent to such an admission when his own application, and the commitment referred to in it, show that he is lawfully detained. A complaint must be made, and the cause of detainer submitted to a judge, before the writ can go. The very object and purpose of this is to

prevent it from being trifled with by those who have manifestly no right to be set at liberty.  It is like a writ of error in a criminal case, which the court or judge is bound to allow, if there be reason to suppose that an error has been committed, and equally bound to refuse, if it be clear that the judgment must be affirmed.

We are not aware that any application to this court for a writ of *habeas corpus* has ever been successful, where the judges, at the time of the allowance, were satisfied that the prisoner must be remanded.  The petitioner's counsel say there is but one reported case in which it was refused, and this fact is given in the argument, as a reason for supposing that in all other cases the writ was issued without examination.  But no such inference can fairly be drawn from the scarcity of judicial decisions on a point like this. We do not expect to find in reports so recent as ours those long-established rules of law, which the student learns from his elementary books, and which are constantly acted upon without being disputed.

The *habeas corpus* is a common law writ, and has been used in England from time immemorial, just as it is now.  The statute of 31 Car. 2, c. 2, made no alteration in the practice of the courts in granting these writs: (3 *Barn. & Ald.* 420-2; *Chitty's Reps.* 207.)  It merely provided, that the judges in vacation should have the power which the courts had previously exercised in term time (1 *Chitty's Gen. Prac.* 586), and inflicted penalties upon those who should defeat its operation.  The common law upon this subject was brought to America by the colonists; and most, if not all the states, have since enacted laws resembling the English statute of Charles II. in every principal feature.  The Constitution of the United States declares that " the privilege of a writ of *habeas corpus* shall not be suspended unless when, in cases of rebellion or invasion, the public safety may require it."  Congress has conferred upon the federal judges the power to issue such writs according to the principles and rules regulating it in other courts.  Seeing that the same general principles of common law on this subject prevail in England and America, and seeing also the similarity of their statutory regulations in both countries, the decisions of the English judges as well as of the American courts both state and federal, are entitled to our fullest respect as settling and defining our powers and duties.

Blackstone (3 *Com.* 132) says that the writ of *habeas corpus* should be allowed only when the court or judge is satisfied that the party hath probable cause to be delivered.  He gives cogent reasons why it should not be allowed in any other case, and cites with unqualified approbation the precedent set by Sir EDWARD COKE and Chief Justice VAUGHAN in cases where they had refused it.  Chitty lays down the same rule (1 *Cr. Law* 101; 1 *Gen. Prac.* 686-7).  It seems to have been acted upon by all the judges.  The writ was refused in Rex *v.* Scheiner (1 *Burr.* 765), and in the

case of The Three Spanish Sailors (2 *Black's R.* 1324.) In Hobhouse's Case (3 *Barn. & Ald.* 420,) it was fully settled by an unanimous court as the true construction of the statute, that the writ is never to be allowed, if upon view of the commitment, it be manifest that the prisoner must be remanded. In New York, when the statute in force there was precisely like ours (so far, I mean, as this question is concerned), it was decided by the Supreme Court (5 *Johns.* 282), that the allowance of the writ was a matter within the discretion of the court, depending on the grounds laid in the application. It was refused in Husted's Case (1, 2 *Com.* 136), and in Ex parte Ferguson (9 *Johns. R.* 139). In addition to this we have the opinion of Chief Justice MARSHALL in Watkin's Case (3 *Peters* 202), that the writ ought not to be awarded if the court is satisfied that the prisoner must be remanded. It was accordingly refused by the Supreme Court of the United States in that case, as it had been before in Kearney's Case.

On the whole we are thoroughly satisfied that our duty requires us to view and examine the cause of detainer *now*, and to make an end of the business at once, if it appears that we have no power to discharge him on the return of the writ.

The prisoner, as already said, is confined on a sentence of the District Court of the United States, for a contempt. A *habeas corpus* is not a writ of error. It cannot bring a case before us in such a manner that we can exercise any kind of appellate jurisdiction in it. On a *habeas corpus*, the judgment even of a subordinate state court cannot be disregarded, reversed, or set aside, however clearly we may perceive it to be erroneous, and however plain it may be that we ought to reverse it if it were before us on appeal or writ of error. We can only look at the record to see whether a judgment exists,. and have no power to say whether it is right or wrong. It is conclusively presumed to be right until it is regularly brought up for revision. We decided this three years ago at Sunbury, in a case which we all thought one of much hardship. But the rule is so familiar, so universally acknowledged, and so reasonable in itself, that it requires only to be stated. It applies with still greater force, or at least for much stronger reasons, to the decisions of the federal courts. Over them we have no control at all, under any circumstances, or by any process that could be devised. Those tribunals belong to a different judicial system from ours. They administer a different code of laws and are responsible to a different sovereignty. The District Court of the United States is as independent of us as we are of it—as independent as the Supreme Court of the United States is of either. What the law and the Constitution have forbidden us to do directly on writ of error, we, of course, cannot do indirectly by *habeas corpus*.

But the petitioner's counsel have put his case on the ground that the whole proceeding against him in the District Court was *coram*

*non judice,* null and void. It is certainly true that a void judgment
may be regarded as no judgment at all; and every judgment is void,
which clearly appears on its own face to have been pronounced by
a court having no jurisdiction or authority in the subject-matter.
For instance, if a federal court should convict and sentence a citi-
zen for libel; or if a state court, having no jurisdiction except
in civil pleas, should try an indictment for a crime and convict
the party—in these cases the judgments would be wholly void.
If the petitioner can bring himself within this principle, then
there is no judgment against him; he is wrongfully imprisoned,
and we must order him to be brought out and discharged.

. What is he detained for? The answer is easy and simple.
The commitment shows that he was tried, found guilty, and sen-
tenced for *contempt of court,* and nothing else. He is now con-
fined *in execution of that sentence,* and for no other cause. This
was a distinct and substantive offence against the authority and
government of the United States. Does anybody doubt the juris-
diction of the District Court to punish contempt? Certainly not.
All courts have this power, and must necessarily have it; other-
wise they could not protect themselves from insult, or enforce
obedience to their process. Without it, they would be utterly
powerless. The authority to deal with an offender of this class
belongs exclusively to the court in which the offence is committed;
and no other court, not even the highest, can interfere with its
exercise, either by writ of error, *mandamus,* or *habeas corpus.* If
the power be abused, there is no remedy but impeachment. The
law was so held by this court in M'Laughlin's Case (5 *W. & Ser.*
276), and by the Supreme Court of the United States in Kear-
ney's Case (7 *Wheaton* 38). It was solemnly settled, as part of
the common law, in Brass Crosbey's Case (3 *Wilson* 183), by a
court in which sat two of the foremost jurists that England ever
produced. We have not the smallest doubt, that it is the law;
and we must administer it as we find it. The only attempt ever
made to disregard it was by a New York judge (4 *Johns. R.* 345),
who was not supported by his brethren. This attempt was fol-
lowed by all the evil and confusion, which Blackstone, and Kent,
and Story declared to be its necessary consequences. Whoever
will trace that singular controversy to its termination will see, that
the chancellor and the majority of the Supreme Court, though
once outvoted in the Senate, were never answered. The Senate
itself yielded to the force of the truths which the Supreme
Court had laid down so clearly, and the judgment of the Court
of Errors in Yates' Case (6 *Johns* 503) was overruled by the
same court the year afterwards, in Yates *v.* Lansing (9 *Johns. R.*
423), which grew out of the very same transaction, and depended
on the same principles. · Still further reflection at a later period
induced the Senate to join the popular branch of the legislature

in passing a statute which effectually prevents one judge from interfering by a *habeas corpus* with the judgment of another on a question of contempt.

These principles being settled, it follows irresistibly, that the District Court of the United States had power and jurisdiction to decide what acts constitute a contempt against it; to determine whether the petitioner had been guilty of contempt, and to inflict upon him the punishment which, in its opinion, he ought to suffer. If we fully believed the petitioner to be innocent—if we were sure that the court which convicted him misunderstood the facts, or misapplied the law—still we could not re-examine the evidence, or rejudge the justice of the case, without grossly disregarding what we know to be the law of the land. The judge of the District Court decided the question on his own constitutional responsibility. Even if he could be shown to have acted tyrannically or corruptly, he could be called to answer for it only in the Senate of the United States.

But the counsel of the petitioner go behind the proceedings in which he was convicted, and argue that the sentence for contempt is void, because the court had no jurisdiction of a certain other matter, which it was investigating, or attempting to investigate, when the contempt was committed. We find a judgment against him in one case; and he complains about another, in which there is no judgment. He is suffering for an offence against the United States; and he says he is innocent of any wrong to a particular individual. He is conclusively adjudged guilty of contempt; and he tells us that the court has no jurisdiction to restore Mr. Wheeler's slaves.

It must be remembered that contempt of court is a specific criminal offence. It is punished sometimes by indictment, and sometimes in a summary proceeding, as it was in this case. In either mode of trial, the adjudication against the offender is a conviction, and the commitment in consequence is execution: (7 *Wheat.* 38.) This is well settled, and I believe has never been doubted. Certainly the learned counsel for the petitioner have not denied it. The contempt may be connected with some particular cause, or it may consist in misbehaviour, which has a tendency to obstruct the administration of justice generally. When it is committed in a pending cause, the proceeding to punish it is a proceeding by itself. It is not entitled in the cause pending, but on the criminal side: (*Wall.* 134.) The record of a conviction for contempt is as distinct from the matter under investigation, when it was committed, as an indictment for perjury is from the cause in which the false oath was taken. Can a person, convicted of perjury, ask us to deliver him from the penitentiary, on showing that the oath, on which the perjury is assigned, was taken in a cause of which the court had no jurisdiction?

Would any judge in the Commonwealth listen to such a reason for treating the sentence as void? If, instead of swearing falsely, he refuses to be sworn at all, and he is convicted not of perjury, but of contempt, the same rule applies, and with a force precisely equal. If it be really true that no contempt can be committed against a court while it is inquiring into a matter beyond its jurisdiction, and if the fact was so in this case, then the petitioner had a good defence; and he ought to have made it on his trial. To make it after conviction is too late. To make it here is to produce it before the wrong tribunal.

Every judgment *must* be conclusive until reversed. Such is the character, nature, and essence of all judgments. If it be not conclusive it is not a judgment. A court must either have power to settle a given question finally and for ever, so as to preclude any further inquiry upon it, or else it has no power to make any decision at all. To say that a court may determine a matter, and that another court may regard the same matter afterwards as open and undetermined, is an absurdity in terms.

It is most especially necessary that convictions for contempt in one court should be final, conclusive, and free from re-examination by other courts on *habeas corpus*. If the law were not so, our judicial system would break to pieces in a month. Courts totally unconnected with each other would be coming in constant collision. The inferior courts would revise all the decisions of the judges placed over and above them. A party, unwilling to be tried in this court, need only defy our authority, and if we commit him, to take out his *habeas corpus* before an inferior judge of his own choosing, and if that judge is of opinion that we ought not to try him, there is an end of the case.

This doctrine is so plainly against the reason of the thing that it would be wonderful indeed if any authority for it could be found in the books. There is none except the overruled decision of Mr. Justice SPENCER, of New York, already referred to, and some efforts of the same kind to control the other courts, made by Sir EDWARD COKE, in the King's Bench, which are now universally admitted to have been illegal, as well as rude and intemperate. On the other hand, we have all the English judges, and all our own, declaring their want of power to interfere with or control one another in this way. I will content myself by simply referring to some of the books in which it is established that the conviction of contempt is a separate proceeding, and is conclusive of every fact which might have been urged on the trial for contempt, and among others want of jurisdiction to try the cause in which the contempt was committed: 4 *Johns. R.* 325, *et seq.*; the opinion of Chief Justice KENT on pages 370 to 375; 6 *Johns.* 503; 9 *Johns.* 423; 1 *Hill* 170; 5 *Iredell* 199; *Id.* 153; 2 *Sandf.* 724; 1 *Carter* 160; 1 *Blackf.* 166; 25 *Miss.* 836; 2 *Wheeler's Criminal Cases*, p. 1;

14 *Ad. & Ellis* 558. These cases will speak for themselves, but I may remark as to the last one that the very same objection was made there and here. The party was convicted of contempt in not obeying a decree. He claimed his discharge on *habeas corpus* because the chancellor had no jurisdiction to make the decree, being interested in the cause himself. But the Court of Queen's Bench held that if that was a defence it should have been made on the trial for contempt, and the conviction was conclusive. We cannot choose but hold the same rule here. Any other would be a violation of the law which is established and sustained by all authority and all reason.

But certainly the want of jurisdiction alleged in this case would not even have been a defence on the trial. The proposition that a court is powerless to punish for disorderly conduct or disobedience of its process in a case, which it ought ultimately to dismiss for want of jurisdiction, is not only unsupported by judicial authority, but we think it is new even as an argument at the bar. We ourselves have heard many cases through and through before we became convinced that it was our duty to remit the parties to another tribunal. But we never thought that our process could be defied in such cases more than in others.

There are some proceedings in which the want of jurisdiction would be seen at the first blush; but there are others in which the court must inquire into all the facts before it can possibly know whether it has jurisdiction or not. Any one who obstructs or baffles a judicial investigation for that purpose is unquestionably guilty of a crime for which he may and ought to be tried, convicted, and punished. Suppose a local action to be brought in the wrong county; this is a defence to the action, but a defence which must be made out like any other. While it is pending, neither a party, nor an officer, nor any other person can safely insult the court, or resist its order. The court may not have power to decide upon the merits of the case; but it has undoubted power to try whether the wrong was done within its jurisdiction or not. Suppose Mr. Williamson to be called before the Circuit Court of the United States as a witness in a trial for murder, alleged to be committed on the high seas. Can he refuse to be sworn, and at his trial for contempt justify himself on the ground that the murder was in fact committed within the limits of a state, and therefore triable only in a state court? If he can, he can justify perjury for the same reason. But such a defence for either crime has never been heard of since the beginning of the world. Much less can it be shown, after conviction, as a ground for declaring the sentence void.

The writ which the petitioner is convicted of disobeying was legal on its face. It enjoined upon him a simple duty, which he ought to have understood and performed without hesitation. That

[Passmore Williamson's Case.]

he did not do so is a fact conclusively established by the adjudication which the court made upon it. I say the writ was legal, because the Act of Congress gives to all the courts of the United States the power "to issue writs of *habeas corpus* when necessary for the exercise of their jurisdiction, and agreeable to the principles and usages of law." Chief Justice MARSHALL decided, in Burr's trial, that the principles and usages referred to in this act were those of the common law. A part of the jurisdiction of the District Court consists in restoring fugitive slaves; and the *habeas corpus* may be used in aid of it when necessary. It was awarded here upon the application of a person who complained that his slaves were detained from him. Unless they were fugitive slaves they could not be slaves at all, according to the petitioner's own doctrine, and if the judge took that view of the subject, he was bound to award the writ. If the persons mentioned on it had turned out, on the hearing, to be fugitives from labour, the duty of the district judge to restore them, or his power to bring them before him on a *habeas corpus*, would have been disputed by none except the very few who think that the Constitution and law on that subject ought not to be obeyed. The duty of the court to inquire into the facts on which its jurisdiction depends is as plain as its duty not to exceed it when it is ascertained. But Mr. Williamson stopped the investigation *in limine;* and the consequence is, that everything in the case remains unsettled. Whether the persons named in the writ were slaves or free— whether Mr. Wheeler was the owner of them—whether they were unlawfully taken from him—whether the court had jurisdiction to restore them—all these points are left open for want of a proper return. It is not our business to say how they ought to be decided; but we do not doubt that the learned and upright magistrate who presides in the District Court, would have decided them as rightly as any judge in all the country. Mr. Williamson had no right to arrest the inquiry because he supposed that an error would be committed on the question of jurisdiction, or any other question. If the assertions which his counsel now make on the law and the facts be correct, he prevented an adjudication in favour of his protegés, and thus did them a wrong which is probably a greater offence in his own eyes than anything he could do against Mr. Wheeler's rights. There is no reason to believe that any trouble whatever would have come out of the case if he had made a true, full, and special return of all the facts; for then the rights of all parties, black and white, could have been settled, or the matter dismissed for want of jurisdiction, if the law so required.

It is argued that the court had no jurisdiction, because it was not averred that the slaves were fugitives, but merely that they owed service by the laws of Virginia. Conceding, for the argu-

ment's sake, that this was the only ground on which the court could have interfered—conceding also that it is not substantially alleged in the petition of Mr. Wheeler—the proceeding was, nevertheless, not void for that reason.

The federal tribunals, though courts of limited jurisdiction, are not *inferior* courts. Their judgment, until reversed by the proper appellate court, are valid and conclusive upon the parties, though the jurisdiction be not alleged in the pleadings, nor in any part of the record: (10 *Wheaton* 192.) Even if this were not settled and clear law, it would still be certain, that the fact on which jurisdiction depends need not be stated *in the process*. The want of such a statement in the body of the *habeas corpus*, or in the petition on which it was awarded, did not give Mr. Williamson a right to treat it with contempt. If it did, then the courts of the United States must set out the ground of their jurisdiction in every *subpœna* for a witness: and a defective or untrue averment will authorize the witness to be as contumacious as he sees fit.

But all that was said in the argument about the petition, the writ, and the facts which were proved, or could be proved, refers to the *evidence* on which the conviction took place. This has passed *in rem judicatam*. We cannot go one step behind the conviction itself. We could not reverse it if there had been no evidence at all. We have no more authority in law to come between the prisoner and the court, to free him from a sentence like this, than we would have to countermand an order issued by the commander-in-chief of the United States army. We have no authority, jurisdiction or power to decide anything here except the simple fact that the District Court had power to punish for contempt a person who disobeys its process—that the petitioner is convicted of such contempt—and that the conviction is conclusive upon us. The jurisdiction of the court on the case which had been before it, and everything else which preceded the conviction, are out of our reach, and they are not examinable by us, and of course not now intended to be decided.

There may be cases in which we ought to check usurpation of power by the federal courts. If one of them should presume, upon any pretence whatever, to take out of our hands a prisoner convicted of contempt in this court, we would resist it by all proper and legal means. What we would not permit them to do against us we will not do against them. We must maintain the rights of the state and its courts; for to them alone can the people look for a competent administration of their domestic concerns; but we will do nothing to impair the constitutional vigour of the general government, which is " the sheet anchor of our peace at home and our safety abroad."

Some complaint was made in the argument about the sentence being for an indefinite time. If this were erroneous it would not

[Passmore Williamson's Case.]

avail here; since we have as little power to revise the judgment for that reason as for any other. But it is not illegal, nor contrary to the usual rule in such cases. It means commitment until the party shall make proper submission: (3 *Lord Raymond* 1108; 4 *Johns. R.* 375.) The law will not bargain with anybody to let its courts be defied for a specified term of imprisonment. There are many persons who would gladly purchase the honours of martyrdom in a popular cause at almost any given price, while others are deterred by a mere show of punishment. Each is detained until he finds himself willing to conform. This is merciful to the submissive, and not too severe upon the refractory. The petitioner, therefore, carries the key of his prison in his own pocket. He can come out, when he will, by making terms with the court that sent him there. But if he chooses to struggle for a triumph—if nothing will content him but a clean victory or a clean defeat—he cannot expect us to aid him. Our duties are of a widely different kind. They consist in discouraging, as much as in us lies, all such contests with the legal authorities of the country.

LOWRIE, J.—I have not been able to doubt that this court is, in many cases, bound to exercise its judgment, as to the propriety of granting the writ, before allowing it to issue. Notwithstanding the words of the act which imposes a penalty for refusing the writ, we are not forbidden to interpret the law; and the necessity of presenting a petition to the court or to a judge thereof; of stating therein whether the prisoner was detained on criminal or on civil process, or neither; of producing the warrant of committal, or accounting for not doing so; and the fact that traitors and murderers, and fugitives from the justice of other states, are excluded from the benefit of the act; and that the writ was not intended for the relief of convict criminals: *Cro. Car.* 168; 1 *Salk.* 348; and was not extended to them by our act; all these matters show plainly enough that the judge or court is not exercising a mere ministerial function in granting the writ. On any other supposition, there is no reason at all for applying to the court, for the prothonotary could grant it as well.

And no one can examine the provisions of Magna Charta; the petition of right, 3 Charles 1; the statute repealing the Star-chamber Court: 16 Ch. 1, c. 10; the *habeas corpus* act of 31 Ch. 1; and ours of 1785, and the numerous kindred statutes to which that investigation will lead him, without perceiving that a free and open court, and a full and open trial before the superior judges by due course of law, have always been regarded as the best guaranty of the liberty of the citizen. He will see, moreover, very plainly, that the *habeas corpus* is only a means by which this end is to be secured, so that no ignorance or tyranny of king, or king's counsel, or minister, or of mere local and infe-

.rior courts, dependent on and governed by local customs, or of justices of the peace, shall imprison a man without a chance of bail, or a hope of obtaining a speedy trial by the law of the land: See 7 *W. & Ser.* 108.

The *habeas corpus* was not intended, and could not be intended to authorize the superior judges, being substantially those of the higher courts of record, to interfere with the jurisdiction of each other. The purpose of the writ was satisfied when the jurisdiction of the superior courts attached, for the state could not know any better means of securing a fair and impartial trial. If that, with the ordinary provisions for the correction of errors, was not sufficient, then humanity has only to acknowledge its incapacity to provide entirely against error and injustice. Certainly the *habeas corpus* was not intended to provide a remedy against the unjust judgments or sentences of the higher courts; and when it is asked for, for such a purpose, it ought to be refused; unless, possibly, when it is asked from a court that may officially revise and correct the proceedings: 7 *Pet.* 572; *Cro. Car.* 175; 1 *Mod.* 119; 14 *Queen's B.* 566; 5 *Com. B.* 418; 1 *B. & C.* 655; 9 *Watts* 416.

But even if our *habeas corpus* act of 1785 did mean to say that the writ shall always be granted when prayed for, it could not be obeyed so far as to conflict with the new order of things introduced in 1789, by the Constitution of the United States. Hence originated other and independent jurisdictions, with which our *habeas corpus* act was not intended to interfere; for when it was passed, it could have no reference to them. How far it can be used in paralyzing those jurisdictions, or subjecting them to those of the states, is proper matter to be decided on the presentation of the petition, or on the return of the writ, as the court may think proper. We saw such difficulties as led us to hear an argument from the petitioner's counsel on the presentation of the petition, and still our difficulties have not been removed.

But I have a very strong impression, that no court is justified in issuing a *habeas corpus* for the purpose of restoring a slave to his master; and that is very plainly the purpose for which the writ was issued out of the District Court. I do not think that our writ has any such purpose, or ever had. It was intended to secure the liberty of the subject, and not to try rights of property. It is sometimes used to obtain the custody of children, but then it proceeds upon the principle that children are restrained of their liberty, who are in a custody that is disapproved by their lawful guardians. Arrived at years of discretion, the writ is not used to retain them in an unwilling subjection. It is not usually allowed in order to recover the possession of an apprentice, as such: 5 *East* 38; 6 *Term R.* 497; 7 *Id.* 741; 11 *Mass.* 63.

The common law of England, as it was when Pennsylvania was

settled, could not have allowed a *habeas corpus* for the purpose of enforcing slavery; for it did not recognise such an institution. The common law remedy, for trying the title to a feudal villein, was the writ *de homine replegiando*, and that was the writ used by us in slave cases: 2 *Dall.* 56; 3 *Binn.* 101; 3 *Ser. & R.* 396; 7 *Id.* 299. And this application of the *habeas corpus* is to my mind seriously startling.

I have, moreover, a very strong impression that there is no way in which the case before the district judge can be regarded, that would entitle the federal judiciary to take cognisance of it; but I will not trouble any one with my reasons for this.

Regarding the matter thus, it seemed to me that there was real merit in the claim that the petitioner should be discharged; and I did not see any very satisfactory reason in opposition to our hearing and deciding the case; and therefore, I was at first willing to grant the writ and hear the other side. I was very strongly impressed by the argument that the district judge exceeded his authority in entertaining the case; and that the Supreme Court of the state has power on a *habeas corpus*, to discharge the prisoner; especially considering that this court is one of general jurisdiction, and part of a government of general powers, whereas the District Court belongs to a government of limited powers, and necessarily partakes of the same character. But this proposition involves consequences so grave in theory at least, and principles so essential to political order, that it ought not to be readily admitted.

We may first set aside the consideration that the federal courts are of limited jurisdiction; for even conceding that they are, it does not follow that we may review and restrain them in the exercise of it. To use this as a reason for treating their acts as void, when we think them unauthorized, is to apply an English reason to an American institution, without any resemblances sufficient to make the application legitimate. The English superior courts might have had very good reasons for treating all the unauthorized acts of their inferior tribunals as void, in order to keep them within their proper limits. But we cannot so treat the United States courts; for, in the English sense, they too are superior courts,- and especially they are not subordinate to us.

The proposition then remains that, whenever any of the public tribunals of the United States exceed the jurisdiction, which, under the Constitution, can be given to them; and in doing so, a citizen is arrested or imprisoned, then our *habeas corpus* is a proper and effectual remedy.

If this is so, then certainly there are places where the Courts of the United States can have but little power for any purpose. Any man, arrested or imprisoned by warrant or execution, or sentence from District, Circuit, or Supreme Courts, or either

[Passmore Williamson's Case.]

House of Congress, may have relief from any friendly county judge wielding the power of the *habeas corpus*. A judge impeached, convicted, and sentenced; a traitor tried and condemned, may still have hope from the *habeas corpus*, if a judge can be found ignorant or insubordinate or degraded enough to declare that his superiors acted without jurisdiction.

And since the force of the argument does not at all depend upon any peculiar virtue in the *habeas corpus*, but simply on the supposed want of jurisdiction in the federal tribunals, we may apply it to all cases. Then we may have summary replevins and ejectments, and prohibitions and injunctions, and attachments to support them, heard and decided by single judges, or even commissioners or justices of the peace, everywhere and without review, for the purpose of testing the validity of the judgments of the United States tribunals; and the constitutionality of federal tax laws and tariffs, and the frustration of disagreeable laws, become perfectly simple and regular.

And if we should do this in any honest belief in its political rightness, we should, of course, be willing to have the same principle applied in reference to our own official system. Then *habeas corpus* would stand as a writ designed to set aside all official order, and to place single judges above the very tribunals of which they are members. See 1 *Watts* 67.

On one occasion the laws of the United States were attempted to be thus summarily set aside, and to prevent it the force bill, 2 March, 1833, s. 7, *P. Laws*, p. 54, declared that *habeas corpus* out of the U. S. Courts shall relieve any person confined by any authority, for acts done in pursuance of any order or decree of a U. S. court. This is not a strange way of protecting one court against the encroachments of another; 1 *Rolle* 315; 2 *Chit. G. Pr.* 317; 1 *Mad. Ch. Pr.* 135. And it is certainly most effectual, for it would protect the marshal in disobeying an order by us to discharge the prisoner: and thus it very plainly forbids us to discharge him. If in this law there is any encroachment upon state rights, it is no more than might have been expected at the time, for the cause of freedom always suffers from the restrictions that become necessary in order to suppress disorder, whether that disorder arises from mere vice or from an over-zealous urging of principles and institutions that are supposed to be good.

If it be meant that the Supreme Court has a peculiar authority to interfere in such cases, I have failed to discover whence it arises. The *habeas corpus* act makes no distinction between the different courts and judges who may exercise the powers given, and I do not see how we can make any, except that which is necessarily involved in the principle of subordination.

All the institutions of the same government, however complex, are intended to be in harmony with each other, and unitedly to

aid in the preservation of order. It is therefore the duty of all public officers to avoid, if possible, all conflict of functions in the execution of their offices, and to follow the principles that provide for this result. The most obvious of these is, that co-ordinate tribunals cannot interfere with each other, nor inferior with superior ones. Without this rule, government would be a mere mob of officials, wanting an essential element of unity, and would soon fall to pieces. Without this the *habeas corpus* law would set aside all order, by allowing the lowest of all subordinate judges to annul, on constitutional grounds, the judgments of every court in the state, even the very highest; and such apparently gross insubordination would be a mere error in judgment, and not an impeachable offence.

The Supreme Court of the state is in no sense the official superior of any of the United States courts, but co-ordinate with them all. We are not set as checks upon each other, and cannot directly review each other's decisions in any matter. Each, of us occupies a different position in our compound system of government, and each of us must answer to our official or political superiors. This court is not set to watch over the federal courts and suspect them of excess of jurisdiction; and we should be ourselves disorderly, if we should assume any control over them, set as co-ordinate tribunals upon an entirely separate foundation. No one will pretend that our writ of prohibition would be of any value there, and hence it is plain that we cannot interfere without disorder.

Like most other writs, *habeas corpus* must be more efficacious in the hands of a superior court than of any subordinate one; for the law of order requires that those who are officially equal shall not sit in review of each other's acts. The cases that illustrate this are very numerous; declaring that the superior courts of law and equity cannot interfere with each other; that the regular courts cannot interfere with the sentences for contempt and breach of privilege, by the Senate or House of Representatives, House of Lords or House of Commons. Where the duty of final decision and the whole control of any matter is given to one set of officers, the interference of others is mere usurpation. And here I may remark that, a sentence for contempt is not essentially different from any other judgment, decree, or sentence. It is a matter adjudicated, and it belongs to the very essence of governmental order that it cannot be reviewed except by the court that pronounced it, or by its official superiors; and, therefore, in this instance, not by us.

It is insisted that this sentence, being an excess of authority, is void, and we are asked to declare it so. Without stopping to notice the habitual misapplication of this word *void*, to all acts of public authority which are made the subject of an opposing criticism, I

[Passmore Williamson's Case.]

may say that it is a plain solecism thus to qualify any act that is so efficient of results. A sentence by which a man is committed to prison and held there, cannot be void. If we wish to treat the subject profitably, we must speak of it more accurately.

Is it meant to say that we must, on *habeas corpus*, inquire whether a court legitimately established has rightly decided the question of its jurisdiction? Substantially this is the same objection that we have already considered. If it is well founded, then it applies to all sorts of cases; for the question of jurisdiction is involved in them all; every judgment rendered is an assertion of the jurisdiction of the court that renders it. If the allegation of want of jurisdiction entitles us to review it, then there are but few cases in the federal courts that are beyond the interference of the state courts, if a defendant desires to have it.

The superior courts in England may treat as void the unauthorized acts of *their* inferiors, and be justified by the peculiarities of their system and the fact of their superiority; but they could not, with propriety, so treat each other. Their practice relative to each other never contained such an element of disorder. A party summoned to answer, is bound to obey, or give a good' reason for not doing so. He cannot treat public authority with contempt. If he thinks that the court lacks jurisdiction, a decent respect for public order requires him to appear and raise the question, so that it may be decided in an orderly way. He need not raise it in order to insure his right to the objection in a court of error; but it may be necessary in order to stop the unauthorized process. Judges cannot keep all the law in their minds, and parties are heard in order that they may insist upon every principle that is in their favour. It would be very disorderly for defendants to hold back an objection to the jurisdiction of the court, and then raise it by rebellion against the public authorities, when the writ of the Commonwealth comes to be executed; and *habeas corpus* would be a most disorderly writ, if it could be thus used in contempt of authority.

Government consists of fallible men, who do not always know their duty; and parties may lose some of their rights, if they do not aid the public officers, by notifying them of their views, and urging them; and questions of jurisdiction are very often as difficult to decide as any other. It is an essential element of judicial authority that it must be the judge of its own jurisdiction; and I do not know that this rule is peculiarly applicable to the higher courts. The lowest must act upon it, subject to the higher social law that is involved in official subordination. Often the question may be erroneously decided. Often such decisions may result in great injury to the citizen; but it is the lot of government to err, because it is human; and a man of well-trained mind will think it no great hardship to submit to authority even in error. In the

name of order, the country demands, and has the right to demand it.

It is usual to say, even of foreign judgments, that, if pronounced by a competent tribunal, and carried into effect without our assistance, they are conclusive of the question decided. And here, "competent tribunal" means one of the regularly established courts of the country and in it. If its government could, according to the law of nations, have jurisdiction of such a case, we concede to the court itself to decide upon its own jurisdiction; 4 *Cranch*, 276; 1 *Rawle*, 389; for we are not interested in the manner in which other states distribute their civil functions among their different departments.

Applying this principle here, our interference is certainly excluded. Not that the United States is a foreign country, but that its courts belong to a different system from the state courts, and thus these respective authorities are, as authorities, foreign to each other. Each must respond to its own superiors; neither can call the other officially to account. I speak not here of the action for damages for excess of authority. True enough, we do thus leave the federal government at liberty to make continual encroachments upon state rights, without being responsible therefor to any organized power; but this cannot be avoided, there can be no organized authority superior to government itself. However we may define its functions, itself must interpret them, subject only to the right of the people to give new instructions. It must be so with every government. Manufacture and repair constitutions and bills of right as we may; multiply checks and restrictions upon official functions as we may, we cannot shut out human error and its consequences, which are sometimes distressing—while we may carry our suspicions of government so far as to take away its real efficiency, as a means of preserving social order; and then we shall reject it as perfectly worthless, and the circumstances of its rejection must give the form to its successor.

In civil matters there can be no moral principle of higher importance than the one that is most deeply involved in this case, the principle of social order. It is a principle of action that is as binding on the conscience as any other. It is the great moral principle of social man. Without it we must endanger and retard our social progress. Without it we confound all official subordination, and infect with disease the very organs of social life. This principle expresses itself, as best it can, in our civil institutions, and thus originating, they are morally entitled to our respect and obedience, imperfect as we may suppose them to be. He that rejects this principle from his moral code, or gives it a low place there, can hardly be an orderly citizen; but must be dangerous to the public peace and progress, in proportion as he is otherwise intelligent, influential, and active. If the Supreme Court, as the

higher impersonation of the judicial order of the state, should set aside this principle, there can be no guaranty for the healthy administration of our social system. In the name of the order which we represent and enforce, I decline any and every usurpation of power or control over the United States judiciary; it being a system collateral to ours, as complete and efficient in its organization, and as legitimate and final an authority as any other. I concur in refusing the writ.

KNOX, J., dissents.