HAMMOND LUMBER CO. v. SAILORS' UNION OF THE PACIFIC et al.

(Circuit Court, N. D. California.  January 20, 1909.)

No. 13,919.

1. CONTEMPT (§ 40*)—NATURE OF PROCEEDINGS TO PUNISH—EVIDENCE—"CRIMINAL PROCEEDING."

A proceeding against members of labor unions to punish them for contempt for prosecuting a criminal conspiracy to violate an injunction, granted by the court in a civil suit, restraining them from interfering with the business or employés of the complainant therein, is a criminal proceeding within the meaning of Rev. St. § 860 (U. S. Comp. St. 1901, p. 661), which provides that no discovery or evidence obtained from a party or witness by means of a judicial proceeding shall be given in evidence or in any manner used against him in any court of the United States in any criminal proceeding.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. § 124; Dec. Dig. § 40.*

For other definitions, see Words and Phrases, vol. 2, pp. 1751–1753; vol. 8, p. 7623.]

2. CRIMINAL LAW (§ 42*)—EVIDENCE—JUDICIAL ADMISSIONS.

To entitle a party in a criminal proceeding against him in a federal court to invoke the protection of Rev. St. § 860 (U. S. Comp. St. 1901, p. 661), providing that no discovery or evidence obtained from a witness by means of a judicial proceeding shall be given in evidence or in any manner used against him in any court of the United States in any criminal proceeding, to exclude testimony given by him in another court in obedience to a subpœna, it is not necessary that he should have claimed the privilege of the statute when such testimony was given, and when he may have had no reason to suppose that an attempt would ever be made to use it against him.  It is sufficient if he claim the exemption at the time the evidence thus obtained is first sought to be so used contrary to the statute.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 45; Dec. Dig. § 42.*]

## Proceeding to Punish for Contempt.

See, also, 149 Fed. 577.

This is a proceeding to have punished for contempt the respondents hereinafter named, for the alleged violation of certain injunctive orders heretofore granted in the above-entitled cause.  The material facts are these:

On July 9, 1906, the complainant filed its bill in this court against the Sailors' Union of the Pacific, Pacific Coast Marine Firemen's Union, Marine Cooks' and Stewards' Association, Andrew Furuseth, Walter McArthur, and a large number of other individuals named therein as defendants, setting up that complainant was engaged in the coast shipping and sea-carrying trade for passengers and freight between the port of San Francisco and other ports of California, and in such business owned and employed certain vessels, with a large amount of capital invested therein and in said trade; that the defendants Sailors' Union of the Pacific, Pacific Coast Marine Firemen's Union, and Marine Cooks' and Stewards' Association were each and all corporations composed of large membership, with their principal offices or headquarters at the port of San Francisco, the members of which were all seafaring men following divers occupations as such; and that said defendant corporations, with the individual defendants named in the bill, had confederated, colluded, and conspired together for the purpose of injuring, obstructing, and interfering with the business of complainant, and preventing complainant from peaceably pursuing the same, and had by violence, intimidation, and other unlawful means, taken and had in pursuance of said conspiracy, interfered to

prevent complainant from securing crews to man its ships, or laborers to load or discharge them, to such an extent as to greatly interrupt, demoralize, and destroy complainant's ability to conduct its said business, and to its great and irreparable injury and damage. A number of specific acts of a violent and unlawful character alleged to have been committed by members of the defendant unions, in boarding complainant's vessels and assaulting and intimidating its employés, are then set forth, and it is alleged that the defendants threaten to and will continue to commit acts of like character against complainant and its employés, and will destroy its ability to carry on its business 'unless restrained by this court. The bill prayed for an injunction to restrain defendants from the commission of further acts of the character complained of. Upon this bill a subpœna was duly issued and served on the two defendants, Sailors' Union of the Pacific and Pacific Coast Marine Firemen's Union, and those defendants alone appeared and made answer thereto. Subsequently, a temporary restraining order was granted by the court, with an order to show cause why an injunction pendente lite should not issue. These orders were served on the defendants, Sailors' Union of the Pacific, the Pacific Coast Marine Firemen's Union, and the Marine Cooks' and Stewards' Association, and in due course those defendants appeared in response thereto. None of the individual defendants were served with these orders, nor did they appear in answer to the same. Thereafter a hearing was had on the order to show cause, and the court granted an injunction pendente lite, which, like its previous restraining order, ran against all the defendants named in the bill, and in substance enjoined and restrained them, their servants, agents, and all persons acting by or under their authority or direction, from in any manner unlawfully interfering with the business of the complainant, and specifically from interfering by violence, threats, intimidation, or other unlawful means with the crews of complainant's vessels, or otherwise molesting them or the other employés of complainant, or in any wise unlawfully interfering with or obstructing complainant's vessels in the conduct of their legitimate business, either in the bay of San Francisco or elsewhere within the jurisdiction of the court. This writ was served on the defendants Sailors' Union of the Pacific, Pacific Coast Marine Firemen's Union, Marine Cooks' and Stewards' Association, and on Andrew Furuseth individually, but on none of the other individual defendants named in the bill. Thereafter the complainant filed in the case the petition on which the present proceeding is based, wherein, after reciting the filing of the bill and issuance of the said injunctive orders, it is set forth in substance that the conspiracy alleged in the bill was inspired by a strike theretofore inaugurated by the defendant unions against the complainant and other shipowners, and in progress at the filing of the bill, growing out of a controversy between the members of said unions and the shipowners on the subject of wages; and that, for the purpose of carrying out said conspiracy and the prosecution of said strike, a committee had been formed by the defendant unions, styled a "strike committee" or "emergency committee," composed of Andrew Furuseth, the secretary of the defendant Sailors' Union of the Pacific, as chairman and chief executive head of such committee, John Carney, secretary of the defendant Pacific Coast Firemen's Union, Eugene Steidel, secretary of the defendant Marine Cooks' and Stewards' Union, and Walter McArthur, E. A. Erickson, John Keane, Harry Lundborg, Edward Anderson, C. C. Simonsen, and John Doe Fulton, all members of one or the other of said defendant unions; that this committee was given absolute control and management of said strike, with full power to adopt and put in execution any and all such measures or means as it might deem desirable or expedient to enforce the demands of said unions and to carry out the purposes of such alleged conspiracy; that the committee had authorized and directed all the acts and things complained of in the bill, and all acts and measures set forth in said petition; that it had employed steam launches and manned them with strikers from the membership of said unions to patrol the bay of San Francisco as pickets in behalf of said unions, with instructions to visit complainant's vessels and those of other shipowners, and to interfere with, frighten, and intimidate the sailors and other employés thereon and deter them from continuing in such service, and, where necessary, to employ force to board said

vessels and take men therefrom, and to prevent said vessels from taking on or discharging freight or securing the necessary crews to handle them or their cargoes, and generally to harass and impede complainant and said other shipowners in the prosecution of their business; that the committee had detailed members of said unions in large numbers with instructions to picket and patrol the various wharves and the entire water front of the city of San Francisco for like purposes of interfering with said vessels and their employés, to intimidate and deter the latter from service thereon, and to assault, beat, and maim them, if necessary, to prevent them from remaining in such employment. It is alleged in substance that these instructions of the committee were fully carried out, and that a general course of unlawful and violent interference with the vessels of complainant and others and intimidation of their employés was indulged in and pursued by such pickets both on the waters of the bay and the harbor front, and such course of conduct continued without let, hindrance, or interruption alike after the issuance and service of the injunctive orders as before, and all with the full knowledge on the part of the members of said committee and of said unions of the existence of such restraining orders. A large number of specific acts against complainant and such other owners are alleged, some committed during the existence of the temporary restraining order and others after the service of the temporary injunction, many of them accompanied by personal violence and some with bloodshed, through the employment of deadly weapons, and all of them characterized by the use of profane and obscene language and opprobrious epithets applied to the employés on said vessels, and, as to this complainant, wholly in derogation and violation of the terms of said injunctive orders.

Upon this petition the complainant asked an attachment against Andrew Furuseth, Walter McArthur, and the other individuals composing said strike committee, and that they and each of them be arrested and brought before the court for contempt in violating the orders of the court as therein alleged, and that they be punished therefor. A citation having been issued and served on the respondents, they appeared and filed separate answers, denying specifically all the acts alleged in the petition, and pleading not guilty to the charge of contempt. Thereupon the matter was referred to an examiner to take the testimony, and, the evidence having been duly returned, the matter has now been submitted to the court for its consideration.

J. Webster Dorsey and Henry Ach, for petitioner.
H. W. Hutton, for respondents.

VAN FLEET, District Judge (after stating the facts as above). A number of questions have been argued, and the case in all its aspects presented with marked ability and earnestness. The pivotal question, however, by reason of its bearing on the admissibility of certain evidence offered by the petitioner before the examiner, is whether this proceeding, as it affects the rights of the respondents, is to be regarded on the one hand as criminal and punitive in character, in which the public is interested, or, on the other, as purely civil and remedial, concerning alone the parties to the controversy. This question subordinates all others, and in the view I take renders the latter largely, if not wholly, immaterial.

It will be observed that the petition upon which the citation is based proceeds upon the theory, not that the respondents here sought to be held personally committed the acts charged as violative of the orders in question, but that those acts were committed by members of the defendant unions, as the result of an unlawful conspiracy and combination formed for that purpose; that the respondents were parties to that conspiracy, and, in their capacity as members of the executive

or strike committee referred to in the petition, had control and direction of all acts and proceedings done and taken in pursuance thereof; and that the acts complained of were thus committed at their instigation and upon their procurement. The evidence in its general course follows this theory; and it will subserve every present purpose to say with reference thereto that it was quite sufficient to show a most flagrant and persistent violation of the orders in question by members of the defendant unions in the commission of many specific acts substantially as charged, and affecting the rights of the complainant, with a full knowledge on the part of those engaged therein of the existence of those orders. The evidence was not sufficient, however, in its general features, to establish the existence of a' conspiracy on the part of these respondents or connect them with the commission of any of the specific acts complained of—and more especially if, by reason of the nature of the proceeding, the same degree of certainty in proof is to be required as obtains in establishing guilt of a criminal offense—the evidence in that respect being very general, vague, and largely hearsay in character. This want being recognized and appreciated by petitioner, to bridge the gap, it produced and offered before the examiner a deposition of the respondent Andrew Furuseth, theretofore taken before a notary public in the case of the California & Oregon Coast Steamship Company v. Sailors' Union of the Pacific, a civil action brought to obtain an injunction, then pending in the superior court of the city and county of San Francisco. This deposition was given by Furuseth in obedience to a subpœna duces tecum served upon him requiring him to appear before the notary at a given time and place and to produce certain minute books and records in his possession as secretary of the said Sailors' Union of the Pacific, the defendant therein, and there testify as a witness. In obedience to the mandate of the subpœna, Furuseth appeared before the notary, produced the required records, and was examined as a witness, and there gave evidence with reference to the proceedings of the defendant unions and their strike committee in the conduct of the strike, which, while not materially implicating the other respondents, does tend, when taken in connection with the other evidence produced before the examiner, to sustain the petitioner's theory. as to the responsibility of the respondent Furuseth for the general course of the defendant unions during the strike, and complained of as violative of the injunction. In brief, while not connecting him directly with any of the specific acts of violence alleged, this deposition tends to show that as the chief executive officer of the Sailors' Union, and as head of the strike committee, it was his brain that conceived and formulated the general method pursued by the unions in the strike; that he chiefly had to do with furnishing the boats and pickets for the patrolling of the water front, and which, from the manner this work was carried out by the strikers and their sympathizers, led to the most, if not all, of the violence complained of.

It is on this evidence that petitioner chiefly relies to connect the respondents with the specific acts charged—or, speaking more exactly, to connect the respondent Furuseth with those acts—for, while petitioner does not in terms concede the insufficiency of the evidence as

to the other respondents, I think from the course of counsel's argument it must be held to do so tacitly. Indeed, it is very clearly manifest from the attitude of petitioner's counsel, as disclosed both by the record and on the argument, that it is the conviction and punishment of the respondent Furuseth that is the main, if not the only, object sought. From the nature of the deposition, therefore, it becomes material to the rights of the respondent Furuseth to determine whether the evidence thus obtained may be considered.

It was objected before the examiner, and is now insisted, that this proceeding is distinctly criminal in character, initiated for the purpose of procuring the punishment of the respondents upon a charge which constitutes a substantive public offense, and that the offered evidence is therefore incompetent and inadmissible, under section 860 of the Revised Statutes (U. S. Comp. St. 1901, p. 661), which provides:

"No pleading of a party nor any discovery or evidence obtained from a party or witness by means of a judicial proceeding in this or any foreign country, shall be given in evidence or in any manner used against him or his property or estate in any court of the United States in any criminal proceeding or for the enforcement of any penalty or forfeiture."

In response to this objection the complainant contends, on the other hand, that the proceeding is strictly civil in character, partaking of the nature of the main suit or action out of which it arises, and is prosecuted solely for the purpose of protecting and enforcing the private rights of complainant which the injunction was sought to protect; that the relief asked against respondents is in no proper sense punitive in its nature, but coercive and remedial only, and that consequently section 860 of the Revised Statutes has no application, and cannot be invoked to exclude the offered evidence. Which of these two contentions is correct, thus presents the crux of the controversy.

The power to punish for contempt is universally recognized as one inherent in the very nature and purpose of courts of justice; it is coeval with their power to administer justice, and, while it may be in some respects limited, cannot be entirely taken away. It subserves at once the double office of protecting the dignity and authority of the tribunal and aiding in the enforcement of civil remedies, and may be exerted in either civil or criminal cases, or independently of either, and either solely for the preservation of the court's authority, or in aid of the rights of the litigant, or for both those purposes combined.

By reason of this twofold attribute, proceedings in contempt are regarded as being in their nature anomalous—that is, possessed of characteristics which render them more or less difficult of ready or definite classification in the realm of judicial power; and this has led to their being aptly styled sui generis. That they are largely of a criminal nature, by reason of the power being one to convict and punish for wrong committed, is universally conceded; and yet that in some respects they partake, by reason of the ends subserved, of the nature of a civil remedy, is likewise recognized. This duel characteristic has given rise to many and bitter controversies in the courts, the difficulty being, in most cases, to determine when a particular proceed-

ing assumes the criminal rather than the civil aspect, or when of both; and if the latter, which feature must control. The question has arisen in a great many cases—much the larger number in the state courts—and the industry of counsel in the present case is evidenced by the fact that few, if any, of the numerous adjudications bearing on the subject, state or federal, have escaped reference in the very voluminous briefs on file. While I have given them consideration, it will not be necessary or expedient to discuss in detail the many citations from the state courts. They are not harmonious, indeed in many instances irreconcilable, while in others the results reached are so manifestly influenced if not dictated by local statutory provisions as to render them of little value in seeking an answer to our present inquiry. Moreover, the question is, I think, very definitely concluded and set at rest by the principles to be deduced from the decisions of the Supreme Court of the United States, to which source this court must in any case first turn for inspiration and guidance. While the cases arising in that court, with one exception, as with most of those cited from the other federal courts and the state courts, have all involved more directly the question as to the power to review judgments convicting of contempt, yet in the consideration of that phase of the subject the court has necessarily gone fully into the nature, character, and purpose of proceedings to punish for contempt, and, while approaching the subject from a slightly different point of view to that here presented, has announced principles which must in my judgment control in the determination of the present question.

An examination of these cases will disclose that that court has from the first declared, and since consistently maintained, that contempt proceedings, while not to be regarded as in any sense a substitute for the ordinary criminal laws of the country (Ex parte Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092), yet, by reason of the very nature of the power involved, they are in their essential characteristics to be deemed primarily criminal and punitory; that while they possess in a sense and for certain purposes a civil and remedial aspect, growing out of the fact that they may be invoked to coerce or aid in the enforcement of a private right or remedy, this aspect can only arise in any instance out of the nature and purpose of the punishment adjudicated, and then only to affect the question of how the judgment awarding such punishment may be reviewed. In other words, the result of those cases is that where the punishment imposed, whether against a party to the suit or a stranger, is wholly or primarily to protect and vindicate the dignity and power of the court, either by fine payable to the government, or by imprisonment, or both, it is deemed a judgment in a criminal case and subject to review only in the manner provided for review of judgments in criminal cases; but where the punishment is by fine directed to be paid to a party in the nature of damages for the wrong inflicted, or by imprisonment as a coercive measure to enforce the performance of some act for the benefit of the party, or in aid of the final judgment or decree rendered in his behalf, in such case the contempt judgment will, if made before final decree, be treated as in the nature of an interlocutory order, or,

if made after final decree, as remedial in nature, and will be reviewed only on appeal from the final decree, or in such other mode as is appropriate to the review of judgments in civil cases. And certain it is, as will furthermore be seen, that the contention of complainant, that the nature of the contempt proceeding in any case necessarily partakes of the nature of the original action or proceeding out of which it arises, is wholly unfounded. The fact that a contempt has arisen in a civil action, such as this, in no way tends to characterize the nature of the proceeding for its correction. While it is true that it would be hard to imagine a contempt of a civil aspect arising in a criminal case, it is equally true that acts of contempt of a criminal aspect do—and most frequently—arise in actions of a purely civil character. Let us turn to the cases with these principles in mind:

The earliest one arising in the Supreme Court was that of Ex parte Kearney, 7 Wheat. 38, 5 L. Ed. 391, where an application was made to that court for a writ of habeas corpus to bring up the petitioner adjudged in contempt in refusing to answer a question put to him on the trial of an indictment in the court below. The application for petitioner's discharge was refused, the court holding that it had no power under the law as it then existed to review criminal cases on appeal by any direct method, and could not, therefore, undertake to do so indirectly; and it is said:

"If this were an application for a habeas corpus after judgment on an indictment for an offense within the jurisdiction of the Circuit Court, it could hardly be maintained that this court could revise such a judgment or the proceedings which led to it, or set it aside and discharge the prisoner. There is in principle no distinction between that case and the present; for, when a court commits a party for a contempt, their adjudication is a conviction, and their commitment in consequence is execution, and so the law was settled upon full deliberation in the case of Brass Crosby, Lord Mayor of London, 3 Wilson, 188."

The next case to come before the court was that of New Orleans v. Steamship Company, 20 Wall. 387, 22 L. Ed. 354, where a suit was brought in the Circuit Court of the United States for an injunction restraining the city of New Orleans from interfering with complainant's possession of certain premises. The injunction was granted, and pending its existence the mayor of the city obtained an injunction from a state court restraining the complainant from rebuilding an inclosure of the premises which the city authorities had destroyed. At this time the mayor was not a party to the suit in the Circuit Court, but was subsequently made such by supplemental bill. A final decree was entered against the defendants in the Circuit Court, and as a part thereof the mayor was adjudged guilty of contempt in suing out the injunction in the state court, and was subjected to a fine therefor. Thereupon the case was taken to the United States Supreme Court on appeal from the final decree, where, among other things, the validity of the punishment of the mayor for contempt was challenged. With respect to that feature of the decree, the court said:

"The fine of three hundred dollars imposed upon the mayor is beyond our jurisdiction. Contempt of court is a specific criminal offense. The imposition of the fine was a judgment in a criminal case. That part of the decree is as distinct from the residue as if it were a judgment upon an in-

dictment for perjury committed in a deposition read at a hearing. This court can take cognizance of a criminal case only upon a certificate of division in opinion."

The case of In re Chiles, 22 Wall. 157, 22 L. Ed. 819, arose out of an original suit in the Supreme Court of the United States brought by the state of Texas to restrain Chiles and another from asserting title to certain bonds claimed to be the property of the state, in which a final decree went in favor of the complainant granting the injunction prayed. Thereafter, notwithstanding the existence of the injunction, Chiles set up a new claim of title to the bonds not embraced in his answer in the suit. A rule being granted that he show cause why he should not be adjudged in contempt for this renewed assertion of title, he was found guilty and adjudged to pay a fine; the court holding that, although the newly asserted title was not pleaded in his answer, it was concluded by the decree, and its assertion an act of contempt; and, speaking of the nature of proceedings to punish for contempt, it is there said:

"Section 725 of the Revised Statutes (U. S. Comp. St. 1901, p. 583) declares that the courts of the United States shall have power to punish by fine and imprisonment for contempts of their authority. And among the cases specially enumerated are 'disobedience or resistance by any officer of the court, or by any party, juror, witness, or other person, to any lawful writ, process, order, rule, decree, or command of the said courts.' Such has always been the power of the courts, both of common law and equity. The exercise of this power has a twofold aspect, namely, first, the proper punishment of the guilty party for his disrespect to the court or its order, and the second, to compel his performance of some act or duty required of him by the court, which he refuses to perform.

"In the former case, the court must judge for itself the nature and extent of the punishment, with reference to the gravity of the offense. In the latter case, the party refusing to obey should be fined and imprisoned until he performs the act required of him, or shows that it is not in his power to do it."

In Hayes v. Fischer, 102 U. S. 121, 26 L. Ed. 95, the defendant was fined for contempt in violating an interlocutory injunction in a patent case, the amount of the fine being ordered paid to the complainant in reimbursement for the damage suffered by the violation of the injunction. In dismissing a writ of error sued out to review the judgment in contempt, it is said:

"If the order complained of is to be treated as part of what was done in the original suit, it cannot be brought here for review by writ of error. Errors in equity suits can only be corrected in this court on appeal, and that after a final decree. This order, if part of the proceedings in the suit, was interlocutory only.

"If the proceeding below, being for contempt, was independent of and separate from the original suit, it cannot be re-examined here either by writ of error or appeal. This was decided more than 50 years ago in Ex parte Kearney, 7 Wheat. 38, 5 L. Ed. 391, and the rule then established was followed as late as New Orleans v. Steamship Company, 20 Wall. 387, 22 L. Ed. 354. It follows that we have no jurisdiction."

Worden v. Searls, 121 U. S. 14, 7 Sup. Ct. 814, 30 L. Ed. 853, was another case where the defendants were found guilty before final decree of violating a preliminary injunction in a patent suit. By one order the defendants were required to pay to the complainant $250 "as a fine for said violation"; and by a subsequent order to pay a

fine of $1,182 to the complainant for "damages and costs"—$682 of this sum as profits made by defendants as a result of the violation of the injunction, and $500 as the expenses of complainant in the contempt proceeding. It was held that these orders, although made as a result of contempt proceedings, were purely remedial and compensatory, and, having been made before final decree, could only be reviewed on appeal from the latter. The court said:

"We have jurisdiction to review the final decree in the suit and all interlocutory decrees and orders. These fines were directed to be paid to the plaintiff. We say nothing as to the lawfulness or propriety of this direction. But the fines were, in fact, measured by the damages the plaintiff had sustained and the expenses he had incurred. They were incidents of his claims in the suit. His right to them was, if it existed at all, founded on his right to the injunction, and that was founded on the validity of his patent. The case differs, therefore, from that of Ex parte Kearney, 7 Wheat. 39, 5 L. Ed. 391. That was an application to this court for a writ of habeas corpus where a person was imprisoned by the Circuit Court of the District of Columbia for a contempt in refusing, as a witness, to answer a question on the trial of an indictment. The application was denied on the ground that this court had no appellate jurisdiction in a criminal case.

"So the fact in the present case that, though the proceedings were nominally those of contempt, they were really proceedings to award damages to the plaintiff, and to reimburse to him his expenses, distinguishes the case from that of New Orleans v. Steamship Co., 20 Wall. 387, 22 L. Ed. 354."

In O'Neal v. United States, 190 U. S. 36, 23 Sup. Ct. 776, 47 L. Ed. 945, O'Neal was found guilty and fined by the District Court for a contempt committed in interfering with and assaulting a trustee in bankruptcy. He sued out a writ of error direct to the Supreme Court, contending that the facts stated in the affidavit did not constitute a contempt, and that the District Court, therefore, had no jurisdiction. The writ was dismissed, the Supreme Court saying:

"That, while proceedings in contempt may be said to be sui generis, the present judgment is in effect a judgment in a criminal case, over which this court has no jurisdiction on error."

The case of In re Debs, supra, arose out of the great Chicago railroad strike of 1894. Debs and his associates, having been convicted of contempt of the United States Circuit Court and imprisoned for the violation of an injunction issued by that court in a suit by the United States against the contemners and others to restrain them from interference with the movement of trains on certain railroads engaged in the transmission of the mails and the transaction of interstate commerce, applied to the Supreme Court for a writ of error to have the judgment reviewed, and also for a writ of habeas corpus to discharge them from custody; claiming, in the first place, that the suit was one which the United States could not maintain for want of interest, and, in the second place, that the acts complained of, and for a commission of which they were adjudged in contempt, were crimes and misdemeanors under the law, over which a court of equity had no jurisdiction, but for a conviction of which they were entitled to a jury trial. These contentions were overruled; the writ of error was denied without an opinion (159 U. S. 251, 15 Sup. Ct. 1039), but, as stated in the subsequent case of the Christensen Engineering Company, 194 U. S. 458, 460, 24 Sup. Ct. 729, 730, 48 L. Ed. 1072, it was denied be-

cause there was in the contempt judgment "nothing of a remedial or compensatory nature. No fine was imposed, but only a sentence of imprisonment. This court had no jurisdiction of a writ of error in such a case." The writ of habeas corpus was likewise denied, and, in summing up their conclusions after a very elaborate discussion of the objections made, it is said with reference to the powers of a court of equity in such a case:

"* * * That, while it may be competent for the government (through the executive branch, and in the use of the entire executive power of the nation) to forcibly remove all such obstructions, it is equally within its competency to appeal to the civil courts for an inquiry and determination as to the existence and character of any alleged obstructions, and, if such are found to exist, or threaten to occur, to invoke the powers of those courts to remove or restrain such obstructions; that the jurisdiction of courts to interfere in such matters by injunction is one recognized from ancient times and by indubitable authority; that such jurisdiction is not ousted by the fact that the obstructions are accompanied by or consist of facts in themselves violations of the criminal law; that the proceeding by injunction is of a civil character, and may be enforced by proceedings in contempt; that such proceedings are not in execution of the criminal laws of the land; that the penalty for a violation of injunction is no substitute for and no defense to a prosecution for any criminal offenses committed in the course of such violation; that the complaint filed in this case clearly showed an existing obstruction of artificial highways for the passage of interstate commerce and the transmission of the mail—an obstruction not only temporarily existing, but threatening to continue; that under such complaint the Circuit Court had power to issue its process of injunction; that, it having been issued and served on these defendants, the Circuit Court had authority to inquire whether its orders had been disobeyed, and when it found that they had been, then to proceed under section 725, Rev. St., which grants power 'to punish, by fine or imprisonment, * * * disobedience, * * * by any party * * * or other person, to any lawful writ, process, order, rule, decree, or command,' and enter the order of punishment complained of; and, finally, that, the Circuit Court, having full jurisdiction in the premises, its finding of the fact of disobedience is not open to review on habeas corpus in this or any other court. [Citations.]"

Some expressions in this case are seized upon by counsel for complainant here as being at variance with the principles announced in preceding decisions of that court as to the nature and purpose of contempt proceedings, and as tending to sustain the view now urged by them. But a consideration of the language of the court, in the light of the questions there under discussion, will show that this is a misapprehension, and that nothing that is there said is in any wise out of harmony with its previous declarations. The court was simply answering the objections there made. This is further emphasized by the later decisions of the court, in which the Debs Case is referred to in a manner to indicate no purpose on the part of the court by anything there said to mark a departure from its previous rulings. This is made quite clear from a comparatively recent case, in which the subject received very full consideration at the hands of the same distinguished member of the court who wrote the opinion in the Debs Case—that of Bessette v. Conkey Company, 194 U. S. 324, 24 Sup. Ct. 665, 48 L. Ed. 997.

In the latter case, like the present, an injunction had issued restraining interference with complainant's business. Bessette was not a party

to the suit, but was convicted of contempt in having violated the injunction with knowledge of its existence, and fined $250. He appealed to the Circuit Court of Appeals, and that court certified the question to the Supreme Court as to whether it had jurisdiction to review the judgment. It was held that by virtue of the provisions of the act of March 3, 1891, c. 517, 30 Stat. 826 (U. S. Comp. St. 1901, p. 547), creating the Circuit Courts of Appeals, and giving those courts jurisdiction to review criminal cases other than capital or those otherwise infamous, they were empowered to review judgments in contempt cases because of their criminal nature, but that such review must be by writ of error, as in other criminal cases, and not by appeal. In the course of its reasoning, it is there said by the court:

"A contempt proceeding is sui generis. It is criminal in its nature in that the party is charged with doing something forbidden, and, if found guilty, is punished. Yet it may be resorted to in civil as well as criminal actions."

And after a discussion and review of all the cases previously decided by it bearing upon the subject, including that of Ex parte Debs, it is said:

"The thought underlying the denial by this court of the right of review by writ of error or appeal has not been that there was something in contempt proceedings which rendered them not properly open to review, but that they were of a criminal nature, and no provision had been made for a review of criminal cases."

And, after holding that the Circuit Court of Appeals act gave a right of review of such judgments not theretofore afforded, it is said:

"As, therefore, the ground upon which a review by this court of a final decision in contempt cases was denied no longer exists, the decisions themselves cease to have controlling authority, and whether the Circuit Courts of Appeals have authority to review proceedings in contempt in the District and Circuit Courts depends upon the question whether such proceedings are criminal cases. That they are criminal in their nature has been constantly affirmed. The orders imposing punishment are final. Why, then, should they not be reviewed as final decisions in other criminal cases?"

This case is likewise relied on by complainant to sustain its contention that the present proceeding is civil and remedial rather than criminal; its reliance being based largely upon a quotation, made by the court in the course of its reasoning, from an opinion of Judge Sanborn in Re Nevitt, 117 Fed. 448, 54 C. C. A. 622, where it is said:

"Proceedings for contempts are of two classes: Those prosecuted to preserve the power and vindicate the dignity of the courts and to punish for disobedience of their orders, and those instituted to preserve and enforce the rights of private parties to suits, and to compel obedience to orders and decrees made to enforce the rights and administer the remedies to which the court has found them to be entitled. The former are criminal and punitive in their nature, and the government, the courts, and the people are interested in their prosecution. The latter are civil, remedial, and coercive in their nature, and the parties chiefly in interest in their conduct and prosecution are the individuals whose private rights and remedies they were instituted to protect or enforce. [Citations.] A criminal contempt involves no element of personal injury. It is directed against the power and dignity of the court, and private parties have little if any interest in the proceedings for its punishment. But if the contempt consists in the refusal of a party or a person to do an act which the court has ordered him to do for the benefit or the advantage of a party to a suit or action pending before it, and he is com-

mitted until he complies with the order, the commitment is in the nature of an execution to enforce the judgment of the court, and the party in whose favor that judgment was rendered is the real party in interest in the proceedings."

But complainant would give to this language a complexion which it will not bear. It must be read in the light of the facts to which it was being applied. Judge Sanborn, like the Supreme Court in employing the quotation, was discussing the effect of a judgment in contempt rather than the nature of the proceeding, and a judgment which, under all the authorities, was purely coercive and remedial in character. There the judges of a county court in Missouri had been adjudged by the United States Circuit Court guilty of contempt in refusing to obey a mandate of that court directing them to levy a certain tax which it was yet within their power to do, and they were adjudged to be imprisoned until they complied with the mandate. They sued out a petition before the Circuit Court of Appeals praying a stay of proceedings until they could apply to the President for their release by pardon. It was in discussing the nature of the contempt judgment, and whether it was one from the effect of which the executive had power to relieve the petitioners, that Judge Sanborn used the language quoted. What was there said is not inappropriate to the facts of that case, although it may not have been wholly necessary to say so much. I am inclined to think that the language was something too broad in its attempted classification of contempt proceedings, and more especially in the somewhat sweeping statement that "a criminal contempt involves no element of personal injury." This was apparently the opinion of the Supreme Court, where, in commenting upon the classification given by Judge Sanborn, it is said:

"It may not be always easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both. A significant and generally determinative feature is that the act is by one party to a suit, in disobedience of a special order made in behalf of the other. Yet sometimes the disobedience may be of such a character and in such a manner as to indicate a contempt of the court rather than a disregard of the rights of the adverse party."

Moreover, that the Supreme Court did not apprehend the language of Judge Sanborn as having the effect ascribed to it by complainant, nor intend by its adoption to recede from its previous rulings on the subject, is manifest from the reiteration therein, as we have seen, in the most sweeping and general terms, of their previous declarations as to the nature and character of such proceedings.

In the still later case of Matter of Christensen Engineering Company, supra, where, in a patent case, the defendant was adjudged guilty of contempt in violating a preliminary injunction, and ordered to pay a fine of $1,000—one-half to the United States, and the other to the complainant—and the Circuit Court of Appeals dismissed a writ of error sued out to review the judgment on the ground that the judgment was civil and remedial and not criminal, the Chief Justice, after referring to Bessette v. Conkey Company and other previous rulings, including the Debs Case, says:

"These authorities show that when an order imposing a fine for violation of an injunction is substantially one to reimburse the party injured by the disobedience, although called one in a contempt proceeding, it is to be regarded as merely an interlocutory order, and to be reviewed only on appeal from the final decree.

"In the present case, however, the fine payable to the United States was clearly punitive and in vindication of the authority of the court, and, we think, as such it dominates the proceeding and fixes its character. Considered in that aspect, the writ of error was justified, and the Circuit Court of Appeals should have taken jurisdiction."

In Doyle v. London Guarantee Company, 204 U. S. 599, 27 Sup. Ct. 313, 51 L. Ed. 641, which is the latest case called to my attention from the Supreme Court touching upon the question under consideration, the Bessette and Christensen Cases are reviewed and fully considered, and the principles therein announced reaffirmed.

The conclusion from these cases would seem to be obvious that a proceeding to punish for contempt must be held to be a criminal proceeding within the terms and meaning, as it clearly is within the spirit, of section 860 of the Revised Statutes above quoted; and this equally whether the proceeding be initiated primarily to vindicate the court's authority, or solely as a coercive or remedial measure to enforce the rights of the litigant, or for both those purposes combined. This must be so, since it necessarily results from the nature of the power to punish for contempt, as interpreted by those cases, that, whatever the primary purpose of such a proceeding may be, it is always within the power of the court to make its judgment in part at least punitive or vindicatory in character. In other words, even in a case where the sole purpose sought by initiating the proceeding is to secure the coercive and remedial action of the court against a party, the court may nevertheless, in its discretion, add a punishment by way of fine or imprisonment for the failure of the contemner to obey its mandate. Take, for instance, a case where the judgment sought was as purely coercive and remedial as that in the Nevitt Case, may it be doubted that it was within the power of the Circuit Court to have added a punitory feature to its judgment by imposing a fine or definite term of imprisonment upon the contumacious officers? I think no one may deny this (see In re Swan, 150 U. S. 637, 14 Sup. Ct. 225, 37 L. Ed. 1207), and therefore it would seem that, for the purpose of invoking the protection of such a right as that given by section 860, the proceeding must always be regarded, from its inception to the point of judgment, as criminal, or at least potentially so, since, until the judgment is given, it cannot be known what its character will be. It is the judgment, therefore, which must eventually in any case determine the character of the proceeding; and this leads to the conclusion that logically, perhaps, instead of characterizing contempt proceedings as criminal or remedial, according to the circumstances, it is contempt judgments that should be so classified. For the purposes for which the question was being considered in the cases adverted to, however, this distinction was not material.

That the proceeding is criminal, in the sense and for the purpose here considered, was expressly held by the Supreme Court of California in the case of Ex parte Gould, 99 Cal. 360, 33 Pac. 1112, 21

L. R. A. 751, 37 Am. St. Rep. 57. Gould was charged with contempt in having violated an injunction issued in a civil suit brought to restrain him and others from carrying on hydraulic mining. Upon the hearing of that charge, the trial court directed him to be sworn as a witness, to which he objected on the ground that he could not be compelled to be a witness against himself, for the reason that the proceeding was criminal in nature. This objection was overruled, and the court ordered him to be sworn; whereupon, acting on the advice of counsel, he refused to take the oath, for which refusal he was adjudged in contempt, and ordered imprisoned until he should purge himself by consenting to testify. The Supreme Court discharged him on habeas corpus, holding that the lower court was not authorized to require him to be sworn, and in its opinion said:

"Article 1, § 13, of the Constitution of this state, declares that: 'No person shall be compelled, in any criminal case, to be a witness against himself.' Section 1323 of the Penal Code provides that 'a defendant in a criminal action or proceeding cannot be compelled to be a witness against himself.' .

"Contempt of court is a public offense, and by section 166 of the Penal Code is expressly declared to constitute a misdemeanor, and the refusal of a witness to be sworn is an offense committed in the presence of the court. It is none the less a criminal offense that the statute authorizes it to be punished by indictment, or information, as well as by the summary proceedings provided in sections 1209–1222 of the Code of Civil Procedure. By these provisions the procedure for the investigation of the charge is analogous to the criminal procedure, and the judgment against the person guilty of the offense is visited with fine, or imprisonment, or both—the essential elements of a judgment for a criminal offense. 'Contempt of court is a specific criminal offense. It is punished sometimes by indictment, and sometimes in a summary proceeding, as it was in this case. In either mode of trial, the adjudication against an offender is a conviction, and the commitment in consequence is execution.' William's Case, 26 Pa. 19, 67 Am. Dec. 374."

In the case of In re Jose (C. C.) 63 Fed. 951, Judge Hanford of this circuit took the same view that such proceedings, being criminal in nature, the rules of procedure obtaining in criminal cases apply to the trial of one charged with a contempt of court, and in the course of his reasoning said:

"Accusations for contempt must be supported by evidence sufficient to convince the mind of the trior, beyond a reasonable doubt, of the actual guilt of the accused, and every element of the offense, including a criminal intent, must be proved by evidence or circumstances warranting an inference of the necessary facts; otherwise, the defendant is entitled to go acquit." ·

There are a number of other cases in both the state and federal courts sustaining the same view, and, while the contention of petitioner is not without support in some of the cases from the state courts, in view of the principles announced by the cases above referred to from the Supreme Court, that contention cannot prevail here.

But conceding, for the sake of argument, that there may be cases where the circumstances alleged and the relief sought are so essentially and entirely civil and remedial as to involve no element of a criminal aspect, and where the court would not be warranted in imposing by its judgment anything in the nature of punishment, the present proceeding very clearly, under the principles announced by the Supreme Court, is not such a case. The facts alleged in this pe-

tition constitute no basis for a judgment of a coercive or remedial character; nor is such the nature of the relief asked. Petitioner is not seeking to require the respondents to perform some act which it is yet within their power to perform; nor is there anything alleged or shown as a foundation for a merely compensatory fine, assuming that such a judgment is ever proper. See Worden v. Searls, supra.

The gravamen of the charge against respondents is entering upon and prosecuting a criminal conspiracy "of such a character and in such a manner" (to employ the language of the Bessette Case) "as to indicate a contempt of the court rather than a disregard of the rights of the adverse party"; a conspiracy so broad in its scope and effect as to involve a violation of the rights, not only of the petitioner, but of many others engaged in the same business, and that by distinctly criminal means. The wrongs complained of are then as much, if not more, of a public than of a private nature; and the prayer of the petition is that the respondents be found guilty and punished therefor. Under such a state of facts it is manifest that, if convicted, the only judgment that could be visited upon the respondents would be one of a punitory nature, either a fine or imprisonment, or both—a judgment that would operate as a deterrent to future acts only. There is nothing civil or remedial in such a judgment. The case, therefore, is distinctly criminal in aspect; in this respect, precisely similar to that of Ex parte Debs.

There is still another respect in which, if necessary to so hold, I am of the opinion that the proceeding would, in any event, under the doctrine of Bessette v. Conkey Co. and the cases there referred to, have to be held criminal in nature as it affects these respondents. This arises on the contention of respondents that they are not parties to the main suit out of which the present proceeding grows, by reason of the fact that, while they are named as defendants in the bill, they were not served with process thereunder nor appeared therein, the service of the subpœna being had upon the defendant unions alone; and that, therefore, while amenable to punishment for a violation of the injunction if committed with knowledge of its existence, they were never brought within the jurisdiction of the court in the original case. The doctrine of the Bessette Case is that contempt proceedings are always to be regarded as criminal in respect to one not a party to the suit, since no coercive or remedial relief can be had against a stranger, but only a judgment punishing him for a violation of the injunction committed with knowledge of its existence.

Petitioner contends that the service on the unions was, under section 338 of the Code of Civil Procedure of this state, a sufficient service upon all the individual members thereof to bring them within the jurisdiction of the court. I am doubtful if this section has any application to such a case; but in view of the conclusion reached above, it is not necessary to definitely determine this question.

There is but one other question which requires notice. It is contended by petitioner that the protection of section 860 is not available to the respondent Furuseth, because his deposition was given without objection, and without claiming the privilege of the statute; that the

section, like the fifth amendment to the Constitution, exempting one from being a witness against himself, must be construed as applying only where the witness has given his evidence under compulsion, .after claiming its protection. The language of the section will not bear this construction; nor has such been the interpretation given it by the courts. While it is conceived in the same spirit as the provision of the Constitution, it is much narrower and more specific. It has by its terms application alike to the pleading of a party or to a "discovery or evidence obtained from a party or witness by means of a judicial proceeding." The pleading or evidence of a party is thus put in the same category with the evidence obtained from a witness, and in the very nature of things the rule of compulsion applied to the exemption in the Constitution cannot be applied here, except such compelling force as is involved or implied from the necessity of a party to appear in defense of his rights, or a witness to answer a subpœna or other process requiring him to appear and testify. The discovery or evidence may have been obtained in a proceeding, and under circumstances such as to give rise to no cause for claiming the exemption afforded by the statute, nor any apprehension that the evidence was to be used in a criminal proceeding, or where, indeed, the proceeding was such as to afford no opportunity or right to interpose the objection. United States v. McCarthy (C. C.) 18 Fed. 87. It would seem, therefore, that so long as the exemption is claimed, as here, at the time the evidence thus obtained is first sought to be used, contrary to the statute, it is interposed in time.

Of course, the statute would not protect one against a discovery made or evidence given voluntarily, and without necessity; but here the evidence was obtained in obedience to a subpœna, requiring the witness to attend and testify, and the evidence given under such circumstances cannot be said to have been given voluntarily, within the meaning of such a statute; and this I take to be the effect of Tucker. v. United States, 151 U. S. 164, 14 Sup. Ct. 299, 38 L. Ed. 112. There. the party had voluntarily filed in the case an affidavit as to certain facts, which was subsequently admitted in evidence, over his objection, to contradict statements made by him upon the stand. It was held that section 860 did not protect him against such use of his vol-. untary statement, and the court said:

"'Discovery or evidence obtained from a party or witness by means of a' judicial proceeding' includes only facts or papers which the party or witness. is compelled by subpœna, interrogatory, or other judicial process to disclose, whether he will or no; and is inapplicable to testimony voluntarily given, or to documents voluntarily produced."

See, also, Counselman v. Hitchcock, 142 U. S. 549, 12 Sup. Ct. 195, 35 L. Ed. 1110; Johnson v. Donaldson (C. C.) 3 Fed. 22; Ex parte Irvine (C. C.) 74 Fed. 954; United States v. Bell (C. C.) 81 Fed. 830–850; United States v. Kimball (C. C.) 117 Fed. 156; Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746; Lees v. United States, 150 U. S. 476, 14 Sup. Ct. 163, 37 L. Ed. 1150.

In Boyd v. United States, supra, speaking of the constitutional provision, to which this statute is akin, Mr. Justice Bradley said:

"Constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be, 'Obsta principiis.'"

It is in this spirit that the provision of the statute under consideration should be construed, and, so construed, it must be held that the use of the deposition of the respondent Furuseth in this proceeding is within its prohibition.

In the argument of petitioner's counsel the idea finds expression, more by implication, perhaps, than in terms, that it will be a failure of justice and reproach to the law, if the respondents are to escape punishment for the grievous wrongs complained of through an objection so largely in the nature of a technicality. As intimated, this is more in the nature of a suggestion than an argument; but it does not address itself to my kindly consideration, and may be answered without difficulty. In the first place, the right invoked under the statute in question is substantial rather than technical, being founded upon a principle as old as the common law itself, and which, as we have seen, finds expression in the Constitution—that a man shall not be compelled to furnish evidence against himself. But if it were otherwise, and the objection more purely technical, it is a right given by the statute, and I know of no principle which would justify the court in denying respondents its benefit. Being a part of the law, the court is as much bound to observe it while it remains on the statute book as any other rule made for its guidance, however substantial and elementary. The function of the court is to apply the law, not to make it; to enforce it, rather than break it. The wisdom of the ages has demonstrated the necessity of surrounding the administration of justice with certain fixed rules and limitations, to avoid the personal equation of the mere will or desire of the individual—which always tends to wrong and oppression. These rules are prescribed for the protection of society itself, and, not infrequently, serve to protect it against itself. They are for the benefit of every man who comes before the court—the guilty and the innocent alike; for it is only by their impartial application that the question of guilt or innocence may be safely reached in any case, and the defendant justly said to have had a fair trial. These rules are not, therefore, to be ignored, for, if they may be disregarded to-day for a good end, they may be as readily disregarded to-morrow for a bad one. There is but one course open to a court, and that, to apply the prescribed rules of law undeviatingly as it finds them; and the judge who, in the supposed interest of justice in a particular case, undertakes to set them at naught, abdicates his sworn judicial function and becomes the abettor of the mob—the only tribunal that may presume to administer its justice untrammeled by the restraint of law.

It follows from the conclusions above expressed that the offered deposition must be excluded; and this leaves the record without suf-

ficient evidence to warrant the conviction of the respondents, or any of them.

As a result, the rule must be discharged, and the petition dismissed; and it is so ordered.