## Dombrowski v. City of Philadelphia

*Henry W. Sawyer, 3rd,* for plaintiff.
*Levy Anderson, City Solicitor,* for defendant.
SPAETH, J., December 20, 1971.—

### NATURE OF THE CASE

The case arises on defendants' preliminary objections to plaintiff's motion for further injunctive relief.

## HISTORY OF THE CASE

On April 5, 1967, plaintiff filed a complaint in mandamus alleging that: plaintiff as a former employe of the City of Philadelphia was eligible to receive benefits under the city's retirement system; the Philadelphia Home Rule Charter requires that the retirement system be "actuarially sound"; city council had failed to appropriate enough money to comply with this requirement; and this failure jeopardized plaintiff's retirement benefits. The complaint was assigned to this court for disposition and, after preliminary objections had been dismissed, was heard on September 12, 1967.

On November 17, 1967, an order was filed that:

1. Defendants shall appropriate and allocate to the retirement system the following amounts:

(a) For 1967: interest on the system's unfunded accrued liability, being $20,937,412.50;

(b) For 1968: the city's share of the system's normal cost, being $19,057,000, plus interest on the system's unfunded accrued liability, being $20,937,412.50;

(c) For each year after 1968 until all of plaintiff's retirement benefits have been paid: the city's share of the system's normal cost plus interest on the system's unfunded accrued liability, as those amounts are determined from time to time by the city's actuaries.[1]

In the opinion accompanying this order, it was provided that defendants might "apply to the Court for permission to comply with the . . . order in accordance with . . . a graduated program":

Defendants appealed to the Supreme Court. In an

---

[1] The expressions "normal cost" and "unfunded accrued liability" will be discussed below.

opinion filed on August 6, 1968, Mr. Justice Cohen dissenting,[2] the court held that: so far as concerned the first two sections of this court's order, pertaining to the years 1967 and 1968, the order should be affirmed; it was proper to permit defendants to comply with the order on a gradual basis, and the court ". . . assume[d] that the court below will still entertain a plan submitted by the city to enable the city, if it so wishes, to comply with the first two sections of the court's order on a gradual basis";[3] but that the third section of this court's order, pertaining to each year after 1968 until all of plaintiff's retirement benefits had been paid, should be vacated as "contain[ing] a directive for the performance of a future act . . . Although we can agree with the court below that, if the city fails to make sufficient appropriations for years subsequent to 1968 and the court's order for subsequent years is vacated, then subsequent and perhaps annual mandamus actions will be necessary to compel performance of the city's duty, we certainly cannot assume that the city, now aware of its obligations, will refuse to act accordingly [footnote omitted]."[4]

On March 14, 1969, defendants filed a petition for leave to comply with this court's order of November 17, 1967, as modified by the Supreme Court, on a gradual basis. The petition was in three parts. The first part recited that the city would each year pay not less than the city's share of the normal cost of the retirement system. The second part asked leave to pay the interest on the unfunded accrued liability for 1967 and 1968 at the rate of $2,240,000 a year for 40 years,

---

[2] Dombrowski v. Philadelphia, 431 Pa. 199, 245 A.2d 238 (1968).

[3] Id. at 224 n.25, 245 A.2d, at 251, n.25.

[4] Id. at 224, 245 A.2d, at 251.

starting with the fiscal year July 1, 1969—June 30, 1970. The third part asked leave to pay the interest on the unfunded accrued liability for 40 years, starting with the fiscal year July 1, 1969—June 30, 1970, at the rate of $4,500,000 for the first year, with an annual increase for each year thereafter.

On April 1, 1969, this court filed an opinion and order granting defendant's petition in part and denying it in part. So far as concerned the request for leave to pay the interest on the unfunded accrued liability for 1967 and 1968, the petition was granted. Otherwise, however, the petition was denied as contrary to the principles that had been established by the opinion and order of the Supreme Court.

The Supreme Court had held that the city was required to pay each year the city's share of the retirement system's normal cost and interest on the system's unfunded accrued liability. Therefore, to the extent that defendant's petition recited that the city would pay the city's share of the normal cost, it recited only that the city would comply with one of its legal obligations. To the extent that the petition asked leave to pay the interest on the unfunded accrued liability on a gradual basis over 40 years, however, it amounted to a request that the city be allowed to depart from one of its legal obligations. According to the schedule of payments proposed by the city, for the first 23 years of the 40 years the city would not pay the interest on the unfunded accrued liability but something less; beginning in the twenty-fourth year, the city would pay each year an amount in excess of the interest on the unfunded accrued liability. The projected discrepancies were substantial. For example: for the first of the 40 years the city proposed to pay only $4,500,000, although the interest it was obliged by the Supreme Court's opinion and order to pay was $20,937,412.50;

and for the last of the 40 years the city proposed to pay $49,740,000.

Thus, the city by its petition sought to shift to future taxpayers an expense that the Supreme Court had held must be paid on a current basis. Even if this court had been inclined to grant such a request, which it was not, it had no power to grant it, for the Supreme Court's opinion had made it plain that this court could not enter an order "contain[ing] a directive for the performance of a future act" (id. at 224, 245 A. 2d at 251) except as the future act pertained to compliance with this court's order of November 17, 1967, requiring payment of the normal cost for 1968 and the interest on the unfunded accrued liability for 1967 and 1968.

Accordingly, this court's order of April 1, 1969, provided:

1. The court's order of November 17, 1967, as modified and affirmed by the Supreme Court, is modified as follows:

"The City of Philadelphia shall pay the sum of $41,874,825, representing interest on the unfunded accrued liability of the City's Retirement System for 1967 and 1968, plus interest on the unpaid balance thereof, by making level payments to the Retirement System of $2,240,000 annually for the next 40 years. The payments shall commence with the fiscal year July 1, 1969—June 30, 1970."

2. Otherwise, defendant's petition is denied.

Thereby, the court required the city to make good past violations, i.e., violations occurring in 1967 and 1968, of the principle of actuarial soundness, at the same time leaving intact the requirement that the city abide by that principle for each year after 1968.

The motion now before the court was filed on December 10, 1971. The first five paragraphs recite or

allude to matters that have just been more fully recited. The motion then continues as follows:

"6. On December 9, 1971 there was reported favorably out of committee to the full city council three bills:

"No. 2727, reducing the retirement age from 60 to 55 for nonuniformed employes;

"No. 2728, amending the definition of average final compensation to include anniversary years; and

"No. 2730, authorizing members of Police and Fire Division-Old to transfer to Police-Fire coverage Plan 50.

"Counsel is informed that, and therefore avers, that these bills will be enacted into ordinance by the city council, counsel being informed that the present mayor and mayor-elect have indicated their approval on the basis of an alleged commitment made to the members of the Municipal Employes Union and, in the case of bill no. 2730, a decision and award of arbitrators.

"7. Counsel is advised that the effects of the passage of the above legislation on the retirement system will be as follows:

"Bill No. 2727:

| | |
|---|---|
| Increase in normal cost | $ 1,902,000 |
| Increase in accrued liability | 30,860,000 |

"Bill No. 2728:

| | |
|---|---|
| Increase in normal cost | $ 112,000 |
| Increase in accrued liability | 1,160,000 |

"Bill No. 2730:

| | |
|---|---|
| Increase in normal cost | $ 281,000 |
| Increase in accrued liability | 4,500,000 |

"(See letter of Levy Anderson, City Solicitor, to Henry Sawyer, III, counsel for plaintiff, dated November 29, 1971)

"8. In order to bring defendants into compliance

with the mandate of the Supreme Court of Pennsylvania, as modified by this court, in exercise of the authority to do so affirmed by the Supreme Court, councilmanic defendants must appropriate and executive defendants must allocate to the retirement system the sum total of the amount set forth above, to wit, $38,815,000, which action will place the retirement system in the same financial situation at which it presently stands, i.e., with an unfunded liability of approximately one-half billion dollars and with 38 years remaining in the city's submitted plan for complying with the court's order respecting the 1967-68 judgment.

"Wherefore, plaintiff prays that an order issue from this court directing defendants to appropriate to the Board of Pensions and Retirement

"(a) the amount of $4,781,000 simultaneously with the passage of bill No. 2730; and

"(b) the amount of $34,034,000 if, as and when City Council enacts bills No. 2727 and No. 2728 into ordinance."

On December 14, 1971, the court heard argument on plaintiff's motion. In the course of argument, counsel for defendants filed preliminary objections, averring:

"1. The court has no jurisdiction to hear the matter in the form presented.

"2. The questions raised in [the] motion as to the appropriations are premature."

The argument disclosed that there is no issue of fact:[5] The first five paragraphs of plaintiff's motion

---

[5] Preliminary objections would admit well-pleaded facts. Counsel for defendants expressed some doubt whether filing "preliminary objections" was the correct procedure to raise the issues that he wished to raise. Whether or not correctly labeled as "preliminary," the objections are sufficient to define the issues.

pleaded matters of record; and the next three pleaded the introduction of the three bills in question, which was a matter of public record, and the increase in normal cost and the unfunded accrued liability that would result were the bills enacted, which plaintiff pleaded by copying a letter from counsel for defendants.

Counsel for defendants did in his argument take issue with plaintiff's allegation that the bills "will be enacted" (paragraph 6 of plaintiff's motion), saying that he did not know whether the bills would be enacted and, in any event, did not expect that they would be enacted in the immediate future; in his judgment the members of the city council before enacting the bills would confer with the mayor-elect, since the financial consequence of enacting the bills would have to be considered in formulating the next city budget. This statement, however, did not create an issue of fact in the sense of an issue that could be resolved by receiving testimony. Plaintiff's allegation is no more than a prediction, and while no doubt the accuracy of some predictions may be determined by receiving testimony, as whether there will be an eclipse of the sun at a given time, plaintiff's prediction is not of this sort but is inherently fallible. It creates, therefore, no issue of fact but an issue of law: Granted the fact that it is uncertain what city council will do, how does this affect the determination of what should be the court's response to defendants' preliminary objections?

One further observation should be made with respect to the absence of any factual issue. Counsel for defendants stated that he agreed with counsel for plaintiff that the city's retirement system must be "actuarially sound." He indicated, however, that he and counsel for plaintiff might differ as to what this meant. Specifically, he noted that plaintiff in his prayer

asked that defendants be ordered to appropriate to the unfunded accrued liability, if the three bills were enacted, a total of $38,815,000, and he said that according to his concept of "actuarial soundness," so great an appropriation would not be required. In reply, counsel for plaintiff conceded that perhaps at a hearing defendants might be able to produce expert testimony that so great an appropriation would not be required, although he maintained that it would be. This exchange between counsel did suggest that had defendants filed an answer to plaintiff's motion, rather than preliminary objections, an issue of fact, susceptible of resolution by the receipt of testimony, would have arisen. However, as will appear, in the view that this court takes of the proceedings, this issue has not yet arisen and so need not be faced now.

## DISCUSSION

1. HOW DOES PLAINTIFF'S MOTION RELATE TO THIS COURT'S ORDER OF APRIL 1, 1969?

It is not possible to decide how to respond to defendants' preliminary objections to plaintiff's motion, in particular, the objection to the court's jurisdiction, until the relationship of plaintiff's motion to this court's order of April 1, 1969, is understood. To understand this relationship, it will be necessary to repeat or summarize some of what has been said in earlier opinions filed in this litigation either by the Supreme Court or by this court.

(a) *Herewith a definition of "normal cost" and "unfunded accrued liability"* [6]

Any retirement system will have certain liabilities. What these will be may be understood by supposing

---

[6] What follows is from pages 10-12 of the opinion accompanying this court's order of November 17, 1967.

that the system is about to be established. The first question will be whether to give credit for services that the employes have performed in the past. It may be decided not to give such credit, in which case the only retirement credits that will be earned will be for services that the employes will perform from the date that the retirement system is established. Generally, however, it is considered that this would be unfair to older employes. If, on this reasoning, it is decided to give credit for services that have been performed, as well as for services that will be performed, the system will have two distinct liabilities.

The first liability will be an "accrued liability." This will be the liability incurred by reason of the decision to give credit for past services. The second liability will be an "accruing liability." This will be the liability currently incurred for future benefits based on current services.

An example will illustrate the two liabilities. Suppose these facts: On December 31, 1966, employe Jones is 50 years old. He has been an employe for 10 years, or since he was 40, and he will continue as an employe for 10 more years, when he will become 60 and retire. If, on December 31, 1966, Jones is given credit for his past 10 years of service, an accrued liability will be created. As the next 10 years pass, the credits that Jones will be given will represent an accruing liability currently incurred in those years.

Suppose now these facts: When Jones retires, at age 60, he will live for 10 years, and will be entitled to a pension of $2,000 a year, or a total pension of $2,000 × 10 = $20,000. If the retirement system is on a "cash-disbursement basis," no provision for this $20,000 will be made in advance; rather, each year, as Jones becomes entitled to his $2,000 annual pension, Jones's former employer will, from cash available,

pay Jones $2,000. If, however, the retirement system is on an "actuarial basis," provision for Jones's pension will be made in advance. This leads to the terms "normal cost" and "unfunded accrued liability."

It will be recalled that Jones served 20 years. What will be the cost of providing enough money to pay him, at the end of that 20 years, a total pension of $20,000? If this cost is spread in a level way over the 20 years that Jones served, it might be $650 a year.[7] This $650 is the "normal cost" of Jones' retirement benefits.

Return now to December 31, 1966, when the decision was made to give Jones credit for the 10 years of service that he had performed. It has been seen that this decision created an accrued liability. From what has just been said, it may now also be seen that this accrued liability may be thought of as an accumulation of 10 years of normal costs, at the rate of $650 a year. Since Jones's employer did not decide until December 31, 1966, to give Jones credit for Jones's past 10 years of service, on December 31, 1966, no funds will have been set aside to meet the accumulated normal costs, or accrued liability, for his past service. Accordingly, the accrued liability will be an "unfunded actuarial liability," since the extent of the liability will have been determined by actuarial assumptions, such as the assumption regarding how long Jones will live.

From this it might be supposed that the unfunded

---

[7] 20 × $650 does not equal $20,000 but $13,000; however, note that each year, as $650 is set aside, interest will be earned; note, too, that the entire $20,000 will not be needed at the end of Jones' employment, as Jones will not be paid $20,000 in a lump sum but rather only $2,000 a year; thus, when Jones retires, his former employer will retain a fund on which interest will be earned, and this interest can be applied toward later payments to Jones.

accrued liability will be $6,500: Jones is being given credit for 10 years of past service, and the normal cost of each year is $650. In fact, however, the unfunded accrued liability will be larger than $6,500. This is so because if Jones's employer had set aside $650 a year for each of the 10 years of Jones' past service, the employer would have more than $10 \times $650 = $6,500$, since the funds that he would have set aside at the rate of $650 a year would have earned interest. Typically, the employer might have had $7,500, and this is the figure that the actuary will use in stating the extent of the retirement system's unfunded accrued liability.

(b) *The nature of the "actuarially sound" retirement system required of the city.*

Section 2-308 of the Philadelphia Home Rule Charter provides that the city council shall set up an "actuarially sound pension and retirement system covering all officers and employees of the City." Accordingly, the council on December 3, 1956, enacted the Retirement System Ordinance, which, as amended, remains in effect. "Actuarially sound" means "financially secure, as determined by actuaries." If a public retirement system, such as the city's, is to be actuarially sound, there must be contributed to the system each year at least the system's normal cost plus interest on the system's unfunded accrued liability.[8]

The manner in which this principle operates may be illustrated by an example based on employe Jones.[9] Assume that the city will earn interest at four

---

[8] The foregoing is a summary of several of the findings of fact that appear on page 61 of the opinion accompanying this court's order of November 17, 1967.

[9] This and the ensuing example appear, respectively, on page 13 and page 18 of the opinion accompanying this court's order of November 17, 1967.

percent. What will be the payments that the city must make each year to ensure that as to Jones the retirement system is maintained on an actuarially sound basis? They will be as follows:

Unfunded accrued liability as of 12/31/66 .... $7,500
Add: Interest for 1967 at 4% .............. ′ 300
Add: Normal cost for 1967 ............... 650

Subtotal ......................... $8,450
Deduct: Payment made for 1967 (being interest on the unfunded accrued liability
+ normal cost) ..................... 950

Unfunded accrued liability as of 12/31/67 ..... $7,500

Thus the city's retirement system would enter 1968 with one year of normal cost set aside, and with no increase in the unfunded accrued liability.

The reason that this is an actuarially sound method of operation may be illustrated by another example. Assume that the city pays the normal cost but not the interest on the unfunded accrued liability. The result will be as follows:

Unfunded accrued liability as of 12/31/66 ..... $7,500
Add: Interest for 1967 at 4% .............. 300
Add: Normal cost for 1967 ............... 650

Subtotal ......................... $8,450
Deduct: Payment of normal cost only ....... 650

Unfunded accrued liability as of 12/31/67 ..... $7,800

Thus if normal cost only is paid, the unfunded accrued liability will increase to the extent of the interest on that liability; and if, to alter the example, not even all of normal cost is paid, the unfunded accrued lia-

bility will further increase to the extent of the unpaid amount. If, as Jones continues in service, the city fails to pay both the normal cost and the interest on the unfunded accrued liability, the unfunded accrued liability will grow by a considerable amount.[10] If this policy prevails not only as to Jones but as to all city employes, the result will be that, in time, the unfunded accrued liability will increase to the point where payments into the retirement system will approach the amounts required to be paid out of the system in the form of benefits to retired employes, which is to say that the system will not be actuarially sound but will be operated on a "pay as you go" basis.[11]

(c) *The importance of an actuarially sound retirement system.*

As the examples that have been discussed above illustrate, if the city's retirement system is operated on an actuarially sound basis, the result will be that at least as to normal cost, provision for Jones's pension, and for the pensions of his fellow city employes, will have been made on a current basis. This is simply an arithmetical way of expressing conclusions of the greatest possible significance both to the present and future development of the city and the happiness of its inhabitants.

As this court observed in the opinion accompanying its order of November 17, 1967:

[10] The record of the hearing on plaintiff's complaint discloses that the city has never systematically paid interest on the unfunded accrued liability and that, in consequence, as of January 1, 1967, the liability was $492,645,000. See opinion accompanying this court's order of November 17, 1967, at 52-3 and 62. See also Dombrowski v. Philadelphia, supra, at 221, n.22, 245 A.2d, at 250, n.22.

[11] This was the condition of the retirement system when the Home Rule Charter was adopted. See opinion accompanying this court's order of November 17, 1967, at 20.

"This is no passing law suit. As the Court noted in Francis v. Corleto, 418 Pa. 417, 423, 211 A. 2d 503, 506 (1965), the City stands as trustee for its thousands of employees, retired and present. Upon its conduct depends the security of the retirement benefits that the City has promised them. Furthermore, when the City undertakes to promise retirement benefits to its employees, it undertakes to pay for them; and when it ignores . . . its obligations under the Charter . . . the result is to impose upon future taxpayers a debt that should be paid now, which may prove to be most unfair, for future taxpayers may wish to spend their money to build fine schools, or to eliminate slums, but may not be able to, at least, not to the extent that they consider necessary, because instead they must pay for accrued retirement liabilities." Opinion at 54.

The Supreme Court stated the issues as follows, the statement being made in the context of determining whether plaintiff had standing to maintain his action:

"Dombrowski's complaint . . . was premised upon his belief that the city's contributions to its retirement fund were insufficient to keep it on an actuarially sound basis. As the testimony below disclosed, the present and past practices had placed the system on an actuarially unsound basis and, if continued, the unsoundness would progressively increase. In essence, then, Dombrowski was attempting to assure himself and all other members of the Philadelphia municipal retirement system that sufficient funds would be present to meet his and others' retirement payments.[17]

---

[17] Actuarial soundness also serves an additional function. It insures that the tax burden generated by the city's contributions to the fund will be distributed in such a manner that 1967 taxpayers are taxed for the benefits earned by 1967 employes. Where the system is operated on a cash disbursements basis . . . , 1967 taxpayers would be taxed to pay for benefits earned by employes

Part of his contract with the city was a promise made by the city, in its Home Rule Charter, that the retirement system would be actuarially sound. The court below found, a finding not here disputed, that the city had not kept its promise. Dombrowski is thus suffering a present impairment of his contractual rights and thus an immediate injury": Dombrowski v. Philadelphia, supra, at 214-15, 245 A. 2d at 246-47.

(d) *The relationship of plaintiff's motion to this Court's order defined.*

It is now possible to define the relationship of plaintiff's motion for further injunctive relief to this court's order of April 1, 1969: the motion is an attempt to preclude defendants from disobeying or interfering with the order, thereby depriving plaintiff, the other members of the retirement system, and the inhabitants of the city, of the benefits of the order.

The Supreme Court by its opinion and order of August 6, 1968, established the principle that the city must each year pay the city's share of the retirement system's normal cost and the interest on the system's unfunded accrued liability. Having established this principle, the court regarded the operation of the system in two parts: the past (1967 and 1968), and the future (the years after 1968). With respect to the future, the court assumed that the city, "now aware of its obligations," id. at 224, 245 A. 2d at 251, would each year pay the normal cost and the interest on the unfunded accrued liability. With respect to the past, the court required the city to make these payments good, affirming this court's order that defendants ap-

---

in past years; furthermore, positing the typical increase each year in municipal employes and benefits, the burden placed on future taxpayers to meet benefits currently being earned (as well as those previously earned) would be even greater."

propriate and allocate to the retirement system, for 1967, $20,937,412.50 interest on unfunded accrued liability, and for 1968, $19,057,000 normal cost and $20,937,412.50 interest on unfunded accrued liability.

Had the city complied with the order, there would be nothing now before this court; the order would have been fulfilled, and if plaintiff, or any other member of the retirement system, believed that city council was about to enact bills in violation of the principle of actuarial soundness as established by the Supreme Court, he would be obliged to institute another mandamus action to compel the city to perform its duty to abide by that principle: Id., at 224, 245 A. 2d, at 251. In fact, however, as has been discussed in the history of the case, the city did not comply with the order, instead seeking, and obtaining, a modification of the order to permit compliance by payments over a 40-year period. As a result, defendants or their successors remain subject to the jurisdiction of this court. Some illustrations may be helpful in understanding the basis and effect of this conclusion.

Suppose that plaintiff's motion had called to the court's attention the fact that the city had not made one of the payments required by the schedule approved by this court's order of April 1, 1969. There could be no question that the court would have the power to order that the payment be made forthwith. The basis for the power would be the Supreme Court's opinion and order holding that the payment was required if defendants were to be prevented from impairing the contractual rights enjoyed by plaintiff as a member of the retirement system. Next, suppose that plaintiff's motion had called to the court's attention that city council had enacted bills changing the benefits promised a member of the retirement system in such a way as to increase the system's normal cost

and interest on unfunded accrued liability, but that defendants had refused to appropriate and allocate to the system the funds needed to pay the increase.[12] Such a series of events would represent as effective a disobedience of this court's order of April 1, 1969, as would a failure to make one of the payments required by the schedule approved by the order. Accordingly, the court would have the same power to act so as to undo the effect of those events, in the sense of requiring such further action as appropriate to eliminate the prejudicial impact of the events on plaintiff's contractual rights, as it would have to order defendants to make a payment required by the schedule.

Counsel for defendants argued that for the court to take such further action would be to direct "the performance of a future act in violation of the dictates" of the Supreme Court's holding in Dombrowski v. Philadelphia, supra, at 224, 245 A. 2d, at 251. The court does not agree with this characterization.

Counsel's argument overlooks the fact that the retirement system is still actuarially unsound. The fact that it is unsound has been established by the Supreme Court's opinion and order. By this court's order of April 1, 1969, permitting payments over 40 years, the unsoundness is gradually being corrected, although, as less than three years of the 40 have elapsed, the correction has not gone very far. Suppose, for the sake of stating the matter in an oversimplified but concrete way, that the unsoundness still present might be described as a 20 percent unsoundness. If the retirement system ordinance were amended by

---

[12] In fact, it will be recalled, plaintiff's motion only suggests that these events may occur, not that they have occurred; whether this is important will be discussed in the next section of this opinion.

the three bills in question so as to increase retirement benefits but the funds to pay for this increase on an actuarially sound basis were not appropriated and allocated to the system, the unsoundness would be increased, suppose to such an extent that it might be described as a 40 percent unsoundness. Plainly, the order of April 1, 1969, requiring the gradual correction of the 20 percent unsoundness, which is to say, the gradual restoration of the impairment of plaintiff's contractual rights, would have been undercut. As Penelope wove by day but unwove by night, so city council would have paid according to the schedule approved by the order of April 1, 1969, but would have undone the payment by its approval of the three bills. The court would stultify itself were it to hold that in such circumstances it was powerless to act.

The gist of plaintiff's prayer is that the court not stultify itself but that it act so as to protect the integrity of its order of November 17, 1967, as modified and affirmed by the Supreme Court's order of August 6, 1968, and as further modified by this court's order of April 1, 1969. All of these orders were entered to protect plaintiff's contractual rights in the retirement system. The Supreme Court has made plain beyond question that if plaintiff's contractual rights are to remain unimpaired, a particular state of equilibrium, "actuarial soundness," must be maintained. To maintain this state of equilibrium, two conditions must continue to exist: each year the city must pay normal cost and interest on unfunded accrued liability; and each year it must make the payments required by the schedule approved by this court's order of April 1, 1969. Plaintiff alleges that defendants are about to disturb the equilibrium by not satisfying the first of the conditions, thereby, as just seen from the 20 percent—40 percent illustration, cir-

cumventing this court's order. To require defendants to conduct themselves so that such circumvention will not occur would not be to order defendants to perform a "future act" as that expression was used by the Supreme Court in Dombrowski v. Philadelphia, supra, and in the cases there discussed; it would rather be only to ensure the performance of an existing, continuing order of this court, entered pursuant to an order of the Supreme Court.

In considering this conclusion, it will be helpful to bear in mind that this court's order, although entered in response to a complaint in mandamus, was essentially equitable in nature. Thus, in Dombrowski v. Philadelphia, supra, the Supreme Court stated:

". . . [W]e have stressed in many cases the similarity between equity proceedings and the function performed by a common pleas court when it entertains a mandamus action. [Footnote omitted.] For example, Hotel Casey Company v. Ross, 343 Pa. 573, 582, 23 A. 2d 737, 742 (1942) contains the following: 'Although . . . [mandamus] is granted by the law side of the court, equitable principles largely govern its issuance . . .' [Citation omitted.] A more recent expression of this view is contained in Francis v. Corleto, 418 Pa. 417, 429, 211 A. 2d 503, 509 (1965): 'Although granted by the law side of the court, mandamus is essentially equitable in nature, requiring the application of equitable principles.'

". . . Since equitable principles control the issuance of the writ of mandamus, we believe that equitable principles equally allow the trial court to enter an order which differs from the specific relief requested": Id. at 219-20, 245 A. 2d at 249.

As equitable principles control the issuance of the writ, so they continue to apply to such proceedings as may be appropriate to enforce the writ.

In Butler County v. Pittsburgh, Harmony, Butler and New Castle Ry. Co., 298 Pa. 347, 148 Atl. 504 (1929), the lower court, sitting in equity, issued an order compelling the county to permit the railway to pass over a bridge, on condition that the railway maintain the bridge and make ordinary repairs. The county, asserting that the railway was not maintaining and repairing the bridge, petitioned for a writ of mandamus to compel compliance with the court's order. In holding mandamus improper to enforce a court's order, the Supreme Court stated:

"The power of a court of equity to enforce its own decrees is a necessary incident to the jurisdiction of the court. 'Without such power, a decree would in many cases be useless. "All courts [of equity] have this power, and must necessarily have it; otherwise they could not protect themselves from insult, or enforce obedience to their process. Without it, they would be utterly powerless" ': Williamson's Case, 26 Pa. 9, 18. The Act of 1836, in giving our courts the jurisdiction and powers of a court of chancery in certain cases, impliedly granted them the power to enforce their decrees by any of the methods ordinarily adopted to compel compliance with their order.

"The powers of equity to enforce a decree, unless circumscribed by statute or equity rules, rest largely in the discretion of the court, and being clothed with inherent power to control its own process, the court will see that no abuse will be perpetrated. . . The jurisdiction of the court continues for the purpose of enforcing the decree: 21 C.J. 692; Winton's App., 97 Pa. 385, 394.

". . . The tribunal to which the first appeal has been made will hold the parties or their property within its grasp: Winton's App., supra. Where there is an unimpeachable final decree, contemplating the per-

formance of a series of acts, the proceedings to enforce compliance with that decree must be through that proceeding; all ancillary steps, even though of a nature independent, must be addressed to that proceeding": Id., at 350-51, 148 Atl. at 505.[13]

Here, there is "an unimpeachable final decree." It is true that the decree might have resulted in a single act, full payment achieving actuarial soundness, thereby ending the court's jurisdiction. However, it did not, but was, instead, modified to become a decree "contemplating the performance of a series of acts," i.e., payments over 40 years. Thereby, defendants and their successors became subject to the continuing jurisdiction of this court.

In Advanced Management Research, Inc. v. Emanuel, 439 Pa. 385, 266 A. 2d 673 (1970), the lower court was confronted with a challenge to its power to enforce its decree by a party who had partially complied with its order and then settled the dispute. Said the court;

"But Emanuel's second argument is that once the case was marked settled, discontinued and ended, the action was terminated and the lower court thereupon lost jurisdiction to enforce the agreement which was incorporated in its decree.

"Appellant thus argues that by his partial compliance with the court's decree, i.e., marking the case settled and discontinued, he may thereby preclude the court from enforcing the remainder of the decree and, in effect, flaunt the chancellor's further directives.

---

[13] And see Commonwealth ex rel. Lieberum v. Lewis, 253 Pa. 175, 98 Atl. 31 (1916); Ex Relatione Scott v. The Jailor, 1 Grant (Pa.) 237 (1855), where the court stated:

"The acts of assembly conferring chancery powers, carry with them, as a necessary incident to the jurisdiction, the authority to enforce decrees . . . unless that authority be excluded by legislative enactment": Id.

Both common sense and common law militate against such a result": Id., at 391, 266 A. 2d, at 676.

2. SHOULD THE COURT, IN THE PROPER EX-ERCISE OF ITS DISCRETION, GRANT THE RE-LIEF PRAYED FOR?

Although defendants are subject to the continuing jurisdiction of the court, whether and how the court will exercise that jurisdiction remains to be decided. It has been observed above that as equitable principles controlled the issuance of the court's order, so they continue to apply to proceedings to enforce compliance with the order. Applying these principles, the court has concluded that in the proper exercise of its discretion it should not at this time grant the relief that plaintiff prays for. There are several factors that have persuaded the court to this conclusion.

First, and most obvious, the bills have not been enacted or even called for a vote; and the outcome of a vote, if it does occur, is a matter of conjecture. Thus, not only is plaintiff not yet injured, he may never be injured. Second, a new mayor and city council have been elected to assume office in less than three weeks. Not only does this fact make the eventual passage of the bills even more speculative, but it would be unfair to the new officials to confront them with a court order resulting from the conduct of their predecessors. Third, counsel for defendants informed the court during argument that an actuarial study of the retirement system is now in process, with a report of the results of the study expected early next year. All parties should have the benefit of this study in determining the actuarial impact of the bills; and it may be that the study will affect whether the bills are enacted.

By refraining from acting, the court does not limit its power to act before passage of the bills. Conceiv-

ably, circumstances might arise that would require injunctive relief before passage of the bills if plaintiff's rights and the integrity of the court's order are to be preserved. If the bills are enacted, plaintiff may determine whether, in his judgment, the impact of the bills is prejudicial to his rights and to the integrity of the court's order, and if he concludes that there is prejudice, may file an appropriate further motion consistent with the principles that have been stated in this opinion. To avoid possible misunderstanding in the event that such a motion is filed: It has been settled by the opinion of the Supreme Court that the retirement system must be "actuarially sound." Counsel for plaintiff has argued that that means that the unfunded accrued liability must remain level, which is to say, in terms of the examples concerning employe Jones, given earlier in this opinion, that the liability must remain at $7,500; evidently counsel for defendant is of the opinion that under some circumstances the $7,500 may increase, and the system remain actuarially sound so long as the interest on the liability is paid. The court does not mean by anything said in this opinion to intimate a view with respect either to the merits of this issue, or to whether the issue has already been settled by the opinion of the Supreme Court. As stated in the history of the case, the issue need not be faced now; perhaps it will never have to be.

The proceeding before the court is in many respects unusual. Ordinarily, there is no occasion for a court to express the conclusion that it has continuing jurisdiction of a matter; and there would have been no occasion here but for plaintiff's motion and defendant's preliminary objections to the motion. Confronted with the motion and the preliminary objections, however, the court had only three alternatives: it could be silent and do nothing; it could dismiss the objections

but grant no relief on the motion, without, however, explaining why; or it could do what it has: dismiss the objections and grant no relief, but explain why.

Whatever else a court should be, it should not be cryptic. Since the court was obliged to rule upon defendants' preliminary objections to plaintiff's motion, no harm could be done by telling plaintiff and defendants that no new action was required because this court had continuing jurisdiction; and to say this, with an explanation of why, hopefully may aid in avoiding confusion on an issue of greatest public importance.

### ORDER

And now, December 20, 1971, defendants' preliminary objections to plaintiff's motion for further injunctive relief are denied, and the court will retain jurisdiction of the matter.